UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

FRED N. and MICHANA A. WESTERFIELD
3577 Golf Wood Drive
Neenah, Wisconsin 54956,

QUIZWIZ LLC
3577 Golf Wood Drive
Neenah, Wisconsin 54956,

ALLAN G. LOEFFLER
N5508 Kathryn Drive
Plymouth, Wisconsin 53073,

ALJL LOEFFLER ENTERPRISES, INC.
N5508 Kathryn Drive
Plymouth, Wisconsin 53073,

Civil Action No. _____

ANNIE S. GELVORIA
2102 Red Arrow Trail
No. 1
Fitchburg, Wisconsin 53711

CORONA VENTURES LLC
3044 Fish Hatchery Road
Fitchburg, WI  53713

JAY SCHLEIS
1399 19-1/4 Street
Cameron, Wisconsin 54822,

GERMAN CREEK SUBS, INC.
2521 Hils Court
Menomonie, Wisconsin 54751,

BECKY AND WARREN MANSKE
2936 Saturn Avenue
Eau Claire, Wisconsin 54703,

QUBS, INC.
2936 Saturn Avenue
Eau Claire, Wisconsin 54703,


RICK TEN PAS

2007 Washington Avenue
Sheboygan, Wisconsin 53081,

TENPAS ENTERPRISES LLC
2007 Washington Avenue
Sheboygan, Wisconsin 53081,

DAN J. SCHWAEGEL
2786 1st Avenue
New Auburn, Wisconsin 54757,

MAURELLY-RAE'S LLC
2786 1st Avenue
New Auburn, Wisconsin 54757,

DONALD MAUL
8003 Blue Bell Drive
Wausau, Wisconsin 54401,

AMERICAN EDGE II, INC.
911 Jackson Street, Suite 207
Wausau, Wisconsin 54403,

WILLIAM C. HARRIS, JR.
2200 Fireside Drive
Racine, Wisconsin 53402

ANTHONY M. HARRIS
1623 N. Jackson Street
Milwaukee, Wisconsin 53202,

HARRIS & HARRIS LLC
2200 Fireside Drive
Racine, Wisconsin 53402,

LINDA M. KNUTSON
2250 Deerfield Road
Eau Claire, Wisconsin 54701,

LWL, INC.
2520 Golf Road
Eau Claire, Wisconsin 54701,

NASIR HANIF
4502 Meadow Circle West
Mequon, Wisconsin 53092,

H&N LLC

8573 N. Meadowside Court
Milwaukee, Wisconsin 53223

JOHN F. AND DAWN L. SCHODRON
6059 Highway 144 S.
West Bend, Wisconsin 53095

and

SCHODRON ENTERPRISES LLC
1136A E. Commerce Blvd.
Slinger, Wisconsin 53086,

      INDIVIDUALLY AND ON BEHALF OF
      ALL OTHERS SIMILARLY SITUATED,

          Plaintiffs,

    vs.

THE QUIZNO'S FRANCHISE COMPANY LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

QUIZNO'S FRANCHISING LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

QUIZNO'S FRANCHISING II LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

THE QUIZNO'S MASTER LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

QFA ROYALTIES LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

QZ FINANCE LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

QIP HOLDER LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

TQSC LLC
1475 Lawrence Street, Suite 400
Denver, Colorado 80202,

RICHARD E. SCHADEN
10563 E. Goosehaven Drive
Lafayette, Colorado 80026,

RICHARD F. SCHADEN
9596 Jeffco Airport Avenue
Westminster, Colorado 80021,

DARIN TWETEN
3291 Pioneer Road
Richfield, WI 53076,

ERIC M. TWETEN
1317 Bobolink Lane
West Bend, WI 53095,

STUART BROWN
3824 Ponderosa Drive East
Eau Claire, Wisconsin 54701,

ERIC BROWN
2416 13th Street
Eau Claire, Wisconsin 54703,

and

CERVANTES CAPITAL LLC
1515 Arapahoe Street
Tower One
10th Floor
Denver, Colorado 80202,

                              Defendants.

---

## CLASS ACTION COMPLAINT

---

The Plaintiffs, individually and on behalf of all others similarly situated, allege by and

through their attorneys, Whyte Hirschboeck Dudek S.C. and Marks & Klein, LLP, as follows:

### NATURE OF CASE

1.      This is a class action brought by Wisconsin franchisees of the Quiznos toasted submarine sandwich shop restaurant chain arising from the illegal business scheme of Quiznos and its web of affiliated entities and individuals who control and operate the Quiznos franchise system (collectively the "Defendants" or "Quiznos").  Through this scheme, Defendants fraudulently induced Plaintiffs and the Class to purchase franchises and thereafter exploited their control and economic power in order to extract exorbitant and unjustifiable payments from their franchisees.  As a result, Defendants reap grossly inflated sales and profits, creating an illusion of corporate growth and business while causing substantial financial harm to existing franchisees.

2.      Quiznos' illegal scheme consists of two primary components.  First, Quiznos engages in a policy of fraudulently and deceptively inducing franchisees to purchase Quiznos franchises by intentionally misrepresenting the true nature of the contractual relationship as well as the financial prospects for the franchise and likelihood of success.  Quiznos further takes advantage of its franchisees through other illegal, deceptive and fraudulent means, including but not limited to its willful practices of: (a) saturating geographic areas with more franchises than the areas could reasonably support; and (b) selling franchises in defined "trade areas" which are in fact arbitrarily defined by Quiznos without any reasonable research into the viability of such trade areas to support even one Quiznos franchise, let alone the multiple franchises that Quiznos sells into a given trade area.

3.      Second, Quiznos exploits the overwhelming economic power it holds over its franchisees by creating a captive artificial consumer market, comprised of all of its franchisees, for products and services that Quiznos requires to begin and continue the operation of a Quiznos franchise.  While concealing the nature of these supplier relationships from potential franchisees, Quiznos uses its exclusive control over the franchise system to, among other things, force its franchisees to: (a) purchase unneeded goods and services; (b) purchase needed goods and

services in amounts far greater than necessary to meet the operational needs of their franchises; (c) work with Quiznos-mandated suppliers and pay to those suppliers excessive prices for goods and services that bear no relation to those that could be achieved in arm's length transactions; (d) accept coupons from customers for free or highly-discounted food items for which franchisees receive no reimbursement from Quiznos and which therefore benefit Quiznos by increasing its sales while causing franchisees to purchase more food products for which they receive literally no compensation; and (e) pay a 4-5% "advertising fee," which Quiznos, in violation of its franchise agreements and representations in its various Uniform Franchise Offering Circulars ("UFOCs"), uses for self-serving purposes, including selling more franchises to unwitting consumers.

4.    The fraudulent intent underlying Quiznos' scheme of deceptively luring franchisees to participate in its system and thereafter extract supra-competitive prices and kickbacks, is demonstrated by its pattern of behavior when the inevitable franchise failures come to pass. Quiznos maintains a policy by which it manipulates its unfair agreements to administer the coup de grace to franchisees when, after the franchisee can no longer bear the ruinous losses caused by Quiznos' exploitation, the franchisee goes out of business only to face the initial threat of a lawsuit by Quiznos to enforce provisions of the franchise agreement that purport to make franchisees legally liable for payment of royalties over the entire 15-year term of the agreement, even though the franchisee has been forced out of business due to Quiznos' fraudulent, deceptive and illegal scheme to increase its revenues and profits at the expense of its franchisees. In lieu of and to prevent Quiznos from bringing a lawsuit (which they threaten the now hapless franchisees with in legal correspondence), Quiznos then seeks a signed, unconditional waiver of all rights from the franchisee, in effect to prevent the franchisee from seeking any redress against Quiznos. In addition, Quiznos takes advantage of these closures to facilitate the movement of a lengthy list

of equally deceived franchisees awaiting store locations, into the same, now-vacant and bankrupt locations. In the process, they are creating a second-generation (and, in some cases, third and fourth generation) franchisee with lower entry costs, as the new franchisee purchases the recovered equipment of the defunct franchisee, all of which Quiznos facilitates, from the recovering bank at pennies on the dollar. In this manner, Quiznos suffers no loss and only a short-term interruption in royalties, while also meeting their requirements to provide locations to their excessive backlog of franchisees. Then, having secured the store in the hands of a new and unwitting franchisee Quiznos extracts the same monies from the new owner—actions geared to continue the illegal scheme of increasing revenues on the backs of those with no control.

5.     Plaintiffs now bring this action alleging violations of: (a) the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c); (b) Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, by reason of Defendants' violation of the Sherman Act, 15 U.S.C. § 1; (c) the Wisconsin Antitrust Act, Wis. Stat. Ch. 133; (d) the Wisconsin Fair Dealership Law, Wis. Stat. Ch. 135 ("WFDL"); (e) the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18 *et seq.*; and (f) claims of common law fraud and breach of contract. Plaintiffs seek declaratory and injunctive relief**,** as well as damages, to remedy Defendants' unconscionable, fraudulent, unlawful and anticompetitive practices in connection with the operation of its franchising scheme.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over the Plaintiffs' claims brought under RICO and the federal antitrust laws pursuant to 28 U.S.C. § 1331. This Court may also exercise supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over each Defendant because they were engaged in an illegal, fraudulent and anticompetitive scheme that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in Wisconsin and throughout the United States. In addition, Defendants engaged in solicitation and service activities within this state or caused persons on their behalf to do so. Personal jurisdiction is also vested because products, materials and things serviced and manufactured by Defendants were used and consumed within this state in the ordinary course of trade.

8. Venue is proper in this Court pursuant to the nationwide venue provisions of RICO, 18 U.S.C. § 1965(a) and (b). Alternatively, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims of the Plaintiffs occurred in this judicial district.

## PARTIES

9. Plaintiffs Fred N. Westerfield and Michana A. Westerfield (the "Westerfields") are husband and wife, who are citizens of Wisconsin residing at 3577 Golf Wood Drive, Neenah, Wisconsin 54956. The Westerfields operate three Quiznos franchises. On July 21, 2003, the Westerfields executed a Franchise Agreement for the operation of Quiznos Store No. 5630, located at 1120 Emmers Lane, Oshkosh, Wisconsin 54904. On February 6, 2004, they executed a Franchise Agreement for the operation of Quiznos Store No. 6894, located at 5725 Windy Drive, Suite A, Stevens Point, Wisconsin 54481. On April 29, 2005, the Westerfields took possession by transfer of existing Quiznos Store No. 6799, located at 1137 Winneconne Avenue, Neenah, Wisconsin 54956.

10. On or about September 8, 2003, the Westerfields formed a Wisconsin limited liability company called Quizwiz LLC, which has its principal place of business at 3577 Golf Wood Drive, Neenah, Wisconsin 54956, through which they operate the franchised Quiznos

restaurant businesses referenced in paragraph #9. Quizwiz LLC is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

11.     Plaintiff Allan G. Loeffler ("Loeffler") is a citizen of Wisconsin who resides at N5508 Kathryn Drive, Plymouth, Wisconsin 53073. Loeffler is a party to a Franchise Agreement executed on October 23, 2000 for the operation of Quiznos Store No. 2053, located at 725-N Woodlake Road, Kohler, Wisconsin 53044.

12.     On or about October 25, 2000, Loeffler formed a Wisconsin corporation called ALJL Loeffler Enterprises, Inc., which has its principal place of business at N5508 Kathryn Drive, Plymouth, Wisconsin 53073, through which he operates the franchised Quiznos restaurant business referenced in paragraph #11. ALJL Loeffler Enterprises, Inc. is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

13.     Plaintiff Anna Gelvoria ("Gelvoria") is a citizen of Wisconsin who resides at 2102 Red Arrow Trail, No. 1, Fitchburg, Wisconsin 53711. Gelvoria is a party to a Franchise Agreement executed on July 30, 2004 for the operation of Quiznos Store No. 7960, located at 3044 Fish Hatchery Road, Fitchburg, Wisconsin 53713.

14.     On July 12, 2004, Gelvoria formed a Wisconsin limited liability company called Corona Ventures LLC, which has its principal place of business at 3044 Fish Hatchery Road, Fitchburg, Wisconsin 53713, through which she operates the franchised Quiznos restaurant business referenced in paragraph #13. Corona Ventures LLC is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

15.     Plaintiff Jay Schleis ("Schleis") is a citizen of Wisconsin who resides at 1399 19-1/4 Street, Cameron, Wisconsin 54822.  Schleis is a party to a Franchise Agreement executed on April 23, 2001 for the operation of Quiznos Store No. 2337, located at 2521 Hills Court, Menomonie, Wisconsin 54751.

16.     On or about July 27, 2001, Schleis formed a Wisconsin corporation called German Creek Subs, Inc., which has its principal place of business at 2521 Hills Court, Menomonie, Wisconsin 54751, through which he operates the franchised Quiznos restaurant business referenced in paragraph #15.  German Creek Subs, Inc. is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

17.     Plaintiffs Becky Manske and Warren Manske (the "Manskes") are husband and wife, who are citizens of Wisconsin residing at 2936 Saturn Avenue, Eau Claire, Wisconsin 54703.  The Manskes are proper party plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

18.     On or about November 8, 2004, the Manskes formed a Wisconsin corporation called Qubs, Inc., which has its principal place of business at 2936 Saturn Avenue, Eau Claire, Wisconsin 54703.  Qubs, Inc. is a party to a Franchise Agreement executed on January 24, 2005 for the operation of Quiznos Store No. 946, located at 913 S. Hastings Way, Eau Claire, Wisconsin 54703.

19.     Plaintiff Rick Ten Pas ("Ten Pas") is a citizen of Wisconsin who resides at 2007 Washington Avenue, Sheboygan, Wisconsin 53081.  Ten Pas was a party to Franchise Agreements executed with Quiznos for the operation of Quiznos Store Nos. 2143 and 2828, located at 2529 S. Business Drive, Sheboygan, Wisconsin 53081 and 1230 N. Taylor Drive, Sheboygan, Wisconsin 53081.  Ten Pas executed the first agreement (Store No. 2143) some time

in 2000 and the second agreement (Store No. 2828) some time in 2001.  In or about February 2004, due to losses proximately caused by Quiznos' unlawful conduct as alleged herein, Ten Pas was forced to cease the operation of Store No. 2143.  Subsequently, in or about May 2004, Ten Pas was forced to cease operation of Store No. 2828 for the same reasons.  Ten Pas no longer maintains copies of his Franchise Agreements.  When he inquired with Quiznos as to obtaining copies, Quiznos advised that it no longer had copies of the agreements because Ten Pas had ended his relationship with Quiznos.

20.     On or about January 2, 2001, Ten Pas formed a Wisconsin limited liability company called TenPas Enterprises LLC, which had its principal place of business at 2007 Washington Avenue, Sheboygan, Wisconsin 53081.  TenPas Enterprises LLC is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

21.     Plaintiff Dan J. Schwaegel ("Schwaegel") is a citizen of Wisconsin who resides at 2786 1st Avenue, New Auburn, Wisconsin 54757.  Schwaegel is a party to a Franchise Agreement executed on July 30, 2000 for the operation of Quiznos Store No.1889, located at 2849 Decker Drive, Rice Lake, Wisconsin 54868.

22.     On or about July 6, 2000, Schwaegel formed a Wisconsin limited liability company called Maurelly-Rae's LLC, which has its principal place of business at 2786 1st Avenue, New Auburn, Wisconsin 54757, through which he operates the franchised Quiznos restaurant business referenced in paragraph #21.  Maurelly-Rae's LLC is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

23.     Plaintiff Donald Maul ("Maul") is a citizen of Wisconsin who resides at 8003 Blue Bell Drive, Wausau, WI 54401. Maul is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

24.     On or about August 22, 1997, Maul formed a Wisconsin corporation called American Edge II, Inc., which has its principal place of business at 911 Jackson Street, Suite 207, Wausau, Wisconsin 54403. American Edge II, Inc. is a party to Franchise Agreements executed on October 20, 2003 and October 23, 2003 for the operation of Quiznos Store Nos. 5820 and 5964, located at 306 17th Avenue, Wausau, Wisconsin 54401 and 4551 8th Street South, Wisconsin Rapids, Wisconsin. In or about December 2005, American Eagle II, Inc. closed Quiznos Store No. 5964 due to its inability to sustain a profit as a result of the conduct proximately caused by Quiznos as alleged in this Complaint.

25.     Plaintiff William C. Harris, Jr. ("William Harris") is a citizen of Wisconsin residing at 2200 Fireside Drive, Racine, Wisconsin 53402. William Harris is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

26.     Anthony M. Harris ("Anthony Harris") is a citizen of Wisconsin residing at 1623 N. Jackson Street, Milwaukee, Wisconsin 53202. Anthony Harris is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

27.     On or about March 3 2003, William Harris and Anthony Harris formed a Wisconsin limited liability company called Harris & Harris LLC, which has its principal place of business at 2200 Fireside Drive, Racine, Wisconsin 53402. Harris & Harris LLC is a party to a Franchise Agreement executed on April 18, 2003 for the operation of Quiznos Store No. 5103, located at 4920 South 74th Street, Greenfield, Wisconsin 53220.

28.     Plaintiff Linda M. Knutson ("Knutson") is a citizen of Wisconsin who resides at 2250 Deerfield Road, Eau Claire, Wisconsin 54701. Knutson is a party to a Franchise Agreement executed on April 1, 2002 for the operation of Quiznos Store No. 945 located at 2520 Golf Road, Eau Claire, Wisconsin 54701.

29.     On or about February 1, 2002, Knutson formed a Wisconsin corporation called LWL, Inc., which has its principal place of business at 2520 Golf Road, Eau Claire, Wisconsin 54701, through which she operates the franchised Quiznos restaurant business referenced in paragraph #28. LWL, Inc. is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

30.     Plaintiff Nasir Hanif ("Hanif") is a citizen of Wisconsin who resides at 4502 W. Meadow Circle, Mequon, Wisconsin 53092. Hanif is a party to a Franchise Agreement executed on November 19, 2001 for the operation of Quiznos Store No. 2958 located at 9078 N. Green Bay Road, Brown Deer, Wisconsin 53209.

31.     On or about February 21, 2002, Hanif formed a Wisconsin limited liability company called H&N LLC, which has its principal place of business at 8573 N. Meadowside Court, Milwaukee, Wisconsin 53223 through which he operates the franchised Quiznos restaurant business referenced in paragraph #30. H&N LLC is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

32.     Plaintiffs John F. Schodron and Dawn L. Schodron (the "Schodrons") are husband and wife, who are citizens of Wisconsin residing at 6059 Highway 144 S., West Bend, Wisconsin 53095. The Schodrons are parties to a Franchise Agreement executed on May 28, 2001 for the operation of Quiznos Store No. 2377 located at 1136A E. Commerce Blvd, Slinger, Wisconsin 53086.

33.     On or about March 20, 2001, the Schodrons formed a Wisconsin limited liability company called Schodron Enterprises LLC, which has its principal place of business at 1136A E. Commerce Blvd, Slinger, Wisconsin 53086, through which they operate the franchised Quiznos restaurant business referenced in paragraph #33.  Schodron Enterprises LLC is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

34.     Defendant The Quizno's Franchise Company LLC ("TQFC") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.  TQFC, in its own right and as the successor to the rights and liabilities of The Quizno's Corporation and The Quizno's Franchise Company, was the franchisor for Quiznos franchises granted prior to July 2002.  Defendant TQFC does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

35.     Defendant Quizno's Franchising LLC ("QF") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.  QF was the franchisor for Quiznos franchises granted between July 2002 and February 2005.  Defendant QF does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

36.     Defendant Quizno's Franchising II LLC ("QFII") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.  QFII was the franchisor for Quiznos franchises granted in and after February 2005. Defendant QFII does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

37.     Defendant The Quizno's Master LLC ("TQM") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver,

Colorado 80202. TQM owns the Quiznos intellectual property, including without limitation trademarks, copyrights, and purportedly confidential information, used by the various Quiznos entities in their operation and control of the Quiznos franchise system. TQM was at certain times material the parent of TQFC and an affiliate of QF. Defendant TQM does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

38.    Defendant QZ Finance LLC ("QZF") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, QZF succeeded to various rights and liabilities of TQFC and QF in or about February 2005. Defendant QZF does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

39.    Defendant QIP Holder LLC ("QIP") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, as of February 2005, QIP succeeded to certain rights and liabilities of TQFC, QF, TQM and/or QZF related to the franchises identified in this Complaint. Defendant QIP does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

40.    Defendant QFA Royalties LLC ("QFA") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, as of February 2005 the owners of the Quiznos entities identified in this Complaint and of other related or affiliated Quiznos entities engaged in a series of transactions that, after the transactions were completed, left QFA as the franchisor for all Quiznos franchise agreements entered into before February 2005. Defendant QFA does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

41.    Defendant TQSC LLC ("TQSC") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, QFII and QFA have delegated their rights, duties and obligations as franchisor under Quiznos franchise agreements in the United States to TQSC for performance. Defendant TQSC does substantial business in Wisconsin and is amenable to personal jurisdiction in Wisconsin.

42.    Defendant Richard E. Schaden ("Rick Schaden") is a citizen of Colorado who resides at 10563 E. Goosehaven Drive, Lafayette, Colorado 80026. Rick Schaden is, upon information and belief, the Chief Executive Officer of QFII, and upon information and belief, holds officer and director positions with one or more of the other Quiznos entities named as Defendants herein.

43.    Defendant Richard F. Schaden ("Dick Schaden") is a citizen of Colorado who resides at 9596 Jeffco Airport Avenue, Westminster, Colorado 80021. Dick Schaden is, upon information and belief, an officer and/or director of one or more of the Quiznos entities named as Defendants herein.

44.    Defendant Darin Tweten ("Darin Tweten") is a citizen of Wisconsin who resides at 3291 Pioneer Road, Richfield, Wisconsin 53076. Darin Tweten is an Area Director for Quiznos who supervises the franchise operations of some of the Plaintiffs. At all times material, Darin Tweten acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

45.    Defendant Eric Tweten ("Eric Tweten") is a citizen of Wisconsin who resides at 1317 Bobolink Lane, West Bend, Wisconsin 53095. Eric Tweten is an Area Director for Quiznos who supervises the franchise operations of some of the Plaintiffs. At all times material,

Eric Tweten acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

46. Defendant Stuart Brown ("Stu Brown") is, upon information and belief, a citizen of Wisconsin who resides at 3824 Ponderosa Drive East, Eau Claire, WI 54701. Stu Brown was an Area Director for Quiznos who previously supervised the franchise operations of some of the Plaintiffs.

47. Defendant Eric Brown ("Eric Brown") is upon information and belief, a citizen of Wisconsin who resides at 2416 13th Street, Eau Claire, Wisconsin 54703. Eric Brown was an Area Director for Quiznos who previously supervised the franchise operations of some of the Plaintiffs.

48. Defendant Cervantes Capital LLC ("Cervantes") is a Colorado limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, 10th Floor, Denver, Colorado 80202. At certain times material, Cervantes maintained its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Cervantes Registered Agent is Patrick E. Meyers, the General Counsel for Quiznos. Upon information and belief, Cervantes Capital employs and pays Rick Schaden, Dick Schaden, and other top executives involved in decision making for the Quiznos franchise system, and the various Quiznos entities pay fees to Cervantes to have Cervantes and its employees run the Quiznos franchise system. In addition, upon information and belief, Cervantes owns or controls American Food Distributors, LLC and/or various affiliates thereof; CLG Leasing LLC; and Source One Distribution, LLC, among other supply companies from whom Plaintiffs and other Quiznos franchisees throughout the United States are required to purchase food products and other supplies for use in their franchised Quiznos restaurants, as well as other "captive" supply companies with which Quiznos

requires Plaintiffs and other Quiznos franchisees to do business. Cervantes does substantial business within Wisconsin and is amenable to personal jurisdiction in Wisconsin.

49.     In this Complaint, the term "Quiznos" refers to the web of affiliated companies, corporations and limited liability companies that, acting together or separately, control and manage the business of the Quiznos franchise system.

## GENERAL ALLEGATIONS

50.     Plaintiffs reallege paragraphs 1 through 49 of this Complaint as if set forth in full.

**Quiznos' Unsustainable Business Plan**

51.     Quiznos has been in business since 1981, and in 1991 began operating a system of franchised toasted submarine sandwiches and offering franchises for sale to members of the public across the United States, including Wisconsin.

52.     From 1994 through 2001, Quiznos operated as a publicly-traded entity. In 2001, Quiznos was taken private by Rick Schaden, Dick Schaden, certain other members of the Schaden family, and others known and unknown (collectively the "Schaden Ownership Group"), who together owned a majority of the shares.

53.     Although 95% of the non-Schaden "outsider" shareholders objected to the going-private transaction, the Schaden Ownership Group used its majority control to force the sale of the minority shareholder interests at $8.50 per share.

54.     Dissenting minority shareholders brought an action in Colorado challenging the fairness of the price they received for their shares, and the court ultimately determined that the fair market value of the minority interests was $32.50 per share (almost four times more than the Schaden Ownership Group had paid for the shares). The court also determined that the $8.50 per share valuation had been established in bad faith.

55.     After the completion of the going-private transaction in 2001, Quiznos adopted a strategy of rapid growth of its franchise system, and at the same time adopted methods of increasing revenues by forcing franchisees to pay ever-higher costs for food supplies and other products from Quiznos-affiliated companies or Quiznos-approved suppliers. These measures have been adopted to inflate Quiznos' profitability and make it more attractive to potential buyers and investors, toward the ultimate goal of allowing the Schadens and other Quiznos insiders to sell their ownership interest for billions of dollars.

56.     In or about April 2006, Quiznos sold an undisclosed stake in the company to the investment firm JP Morgan Partners and/or an affiliate of JP Morgan Partners (collectively "JP Morgan"). Upon information and belief, Quiznos sold JP Morgan Partners a 49% share of Quiznos for approximately $585 million, with JP Morgan having the opportunity to purchase the remainder of the shares still held by the Schadens Ownership Group at a specified time and for a specified price if certain conditions are met.

57.     For Quiznos to complete the sale of itself to JP Morgan, it must maintain and even improve the financial results, including substantial revenue growth, it has experienced over the last several years. To this end, Quiznos has continued and even enhanced a number of deceptive and fraudulent practices with respect to its franchisees that allow it to extract millions upon millions of dollars from the franchisees, while simultaneously making it difficult if not impossible for most Quiznos franchisees to operate profitably.

**Quiznos' Fraudulent Misrepresentations to Franchisees**

58.     At the same time Quiznos solicits new franchisees to enter into unconscionable and burdensome franchise agreements, it engages in a policy whereby it accepts substantial payments from potential franchisees, in exchange for the right to operate a franchise that Quiznos knows, or should reasonably know, will in all likelihood fail.

59.     Quiznos touts itself as one of the fastest-growing Quick-Service Restaurant ("QSR") franchise chains in the United States. Over the last several years, the number of franchised outlets claimed by Quiznos has risen dramatically, from approximately 1,500 at the beginning of 2003 to over 5,000 as of the filing of this action. A continued rapid increase in the number of Quiznos franchises sold is an important element in Quiznos strategy of continuing to experience substantial growth in revenues.

60.     Upon information and belief, Quiznos under-reports it closure rates, does not report its turnover rates, and does not identify that the vast majority of its existing franchisees are single store owners, in a deliberate effort to conceal and prevent prospective franchisees from obtaining information that would educate them of the true risks involved in this franchise venture, the potential for loss of a franchisee's invested capital, and the lack of opportunity to become a successful multi-store franchisee (the very concept of franchising from a franchisee perspective).

61.     While Quiznos was inducing Plaintiffs and others to invest into the company, it concealed the fact that the company was unable to support its franchise system. For example, in a December 12, 2003 Quiznos submission drafted by Fredric Cohen, Esq., Quiznos attorney, Quiznos claimed that "40% of Quiznos units are not breaking even (Meyers (5/5/03) 65:23-66:1)." This material fact was never (and has never been) disclosed to any of the Plaintiffs despite Quiznos knowledge of it. Moreover, as of December 31, 2005, the Quiznos system included 2,940 signed franchises that had not opened a location within the required 12 months after signing and therefore may be terminated. During that same year, there were 432 transfers, 195 cancellations or terminations, and an additional 106 franchises left the system.

62.     Further, during required corporate training for new franchisees, Quiznos represents through the use of inaccurate and deceptive graphs, charts and related calculations that

within five years, a Quiznos location would be debt free and maintain a substantial resale value. Based upon these deceptive figures, Quiznos encourages and induces existing franchisees to purchase multiple locations, before they can become aware of the true lack of profitability resulting from Quiznos' fraudulent policies and practices.

**Quiznos' Unconscionable and Unenforceable Franchise Agreements**

63.    Based upon the misrepresentations stated throughout this Complaint, Quiznos exploits its overwhelming bargaining power to require the franchisees to sign overwhelmingly one-sided adhesive franchise agreements, without any potential for negotiation of their terms.

64.    These misleading and deceptive franchise agreements purport, among many other things, to give Quiznos unilateral control over all significant aspects of franchisee operations, to truncate unreasonably any statutes of limitations that may apply to franchisees' legal claims, to disclaim any responsibility for the effect of Quiznos' decisions and actions on the franchisees' viability, and to restrict the ability of franchisees to litigate in their home states, to join with other franchisees to press claims, and to enjoy their Constitutionally-guaranteed right to a jury trial.

65.    The terms of the agreements, and their "Operations Manual" (which Quiznos routinely updates and uses as an extension of the franchise agreement in order to expand upon the terms of the original agreement), are in combination so burdensome on franchisees and so one-sided in favor of Quiznos that they can only be regarded as unconscionable and unenforceable.

**Quiznos' Policy of Extracting Unlawful Profits From Its Franchisees**

66.    Once ensnared in the Quiznos' scheme, Quiznos defrauds its existing franchisees through tying the franchisees' use of the Quiznos trademark and right to participate in the franchise system to the supply of food products, supplies, services, and other things necessary for operation of the franchised restaurants ("Essential Goods").

67.     The franchise agreements provide that the franchisee must "purchase all equipment, products, services, supplies and materials required for the operation of the Restaurant from manufacturers, suppliers or distributors designated by Franchisor or its affiliates." These products include fungible staple food items such as meat, cheese, condiments, as well as services such as Muzak and cash register system leases.

68.     Quiznos franchisees enter into their franchise agreement with limited and deceptive information regarding the nature of this tying policies. The agreements contain a provision allowing the use of undesignated suppliers with Quiznos' approval, but this provision is meaningless and misleading because such approval is rarely, if ever, granted. Moreover, the very process for alternate-supplier approval is deliberately vague, complex and with no timelines for approval, frequently resulting in no response whatsoever to requests made, or no reasonable explanations for disapprovals.

69.     After locking franchisees into the system, Quiznos exploits its unilateral control over the purchases that franchisees must make in two principal ways. First, with respect to Essential Goods that Quiznos or one of its affiliated corporations such as American Food Distributors LLC and Continental Leasing, LLC sells directly and/or through their suppliers or distributors to franchisees, Quiznos charges prices for those Essential Goods that Quiznos knows to be higher than franchisees could obtain for products, materials and services of equal or even higher quality from independent third-party vendors in a competitive market. This practice results in Quiznos and/or its affiliated companies reaping revenues and profits greatly in excess of what they would be if franchisees were not bound to buy from Quiznos at the peril of being deemed in default and losing their franchise. Second, Quiznos requires franchisees to purchase certain Essential Goods that are sold by Quiznos-approved vendors, through which Quiznos maintains a financial interest. It is Quiznos' policy in such cases to require that independent

suppliers, as a condition of becoming an approved source of products, services or materials to Quiznos' franchisees, pay kickbacks to Quiznos, which are euphemistically termed "rebates" by Defendants. Quiznos requires approved vendors to pass along the cost of the kickbacks to its franchisees, resulting in the franchisees' being required, once again, to pay prices for products, services and materials that are higher than franchisees could obtain from independent third-parties in a competitive market.

70. Through its "rebate" scheme, Quiznos and companies and individuals affiliated with it reap substantial revenues and profits that come at the direct expense of its franchisees. This deliberate coercion, carried out using threats and intimidation, creates an environment where franchisees and their invested capital are preyed upon as the most important, immediate and dependable source of revenue and cash flow for the franchisor, with little concern demonstrated by the franchisor regarding the franchisees positive cash flow generated through the sale of the franchisor's actual food products, even though these products are purported by the franchisor to be their primary business interest, but in fact are not. Moreover, once franchisees become aware of this fraudulent scheme, the sunk costs, onerous contractual provisions, and costs of switching to another franchisor make it economically prohibitive to escape the Quiznos franchise agreement.

71. Even after signing the franchise agreement, as a condition of franchisee ownership, Quiznos requires franchisees to sign supplemental contracts for franchisor-mandated services. These contracts are equally one-sided, favoring the franchisor, and designed to prevent the prospective franchisee from being able to comprehend the actual impact to the franchisee's bottom line. The franchisor promotes these mandated services as being critical to "the brand" when in fact they have no direct connection to the brand whatsoever, while the true intent of these mandated services is to provide kickbacks to the franchisor.

72.     Defendants' practices of knowingly overcharging franchisees and requiring kickbacks from approved vendors are directly contrary to Quiznos' representations to franchisees made in its various UFOCs, which provide, for example, in 2003 and 2004, that "[w]e and our affiliates negotiate purchase agreements with suppliers for the benefit of Franchisees." These practices as described herein are also directly contrary to statements routinely made by Quiznos' Area Directors (who supervise the franchisees regionally) and others involved in the process of inducing the public to purchase Quiznos franchises, to the effect that Quiznos uses its "buying power" created by the size of its franchise system to negotiate volume discounts from suppliers and pass those discounts on to franchisees.

73.     Quiznos and its affiliated entities receive substantial revenues from Quiznos systematic and fraudulent overcharging on direct sales to franchisees and kickbacks on sales made by approved vendors to franchisees. For example, upon information and belief, the Cervantes-owned American Food Distributors LLC had $93,324,012 in 2005 revenues, in addition to $33,353,377 in kickbacks from approved food vendors. Upon information and belief, Cervantes-owned Source One Distribution LLC, which sells equipment directly and/or through suppliers and distributors to Quiznos franchisees for their stores, received kickbacks from approved equipment vendors of $4,809,233 in addition to revenues of $60,365,204 in 2005.

**CLASS ACTION ALLEGATIONS**

74.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons defined as:

> All Wisconsin residents (including persons and business entities) that owned a Quiznos franchise during the longest period permitted by the applicable statutes of limitations. Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

**Rule 23(a)**

75. **Numerosity**:  Members of the Class are so numerous that their individual joinder is impractical.  The precise identities, number and addresses of members of the Class are unknown to Plaintiffs, but may and should be known with proper and full discovery of Defendants, third parties, and their respective records.

76. **Existence of Common Questions of Fact and Law**:  There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class.  The common questions of fact and law include:

(a)  Whether and to what extent Defendants' practices and conduct, and misrepresentations violate federal or state law;

(b)  Whether Defendants have engaged in mail and wire fraud;

(c)  Whether Defendants engaged in a pattern of racketeering activity;

(d)  Whether the Quiznos franchise system is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(e)  Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a);

(f)  Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(a) and (c) proximately caused injury to the Plaintiffs' and class members' business or property;

(g)  Whether the market for participation in the Quiznos franchise system constitutes a product market in which Defendants maintain substantial market power;

(h)  Whether Defendants unlawfully coerced franchisees to purchase specific goods and services from them as a condition for the right to participate in the Quiznos franchise system;

(i)  Whether such anti-competitive tying violates state and/or federal law;

(j)     Whether Defendants' unlawful anticompetitive practices violate 15 U.S.C. § 1;

(k)     Whether Quiznos' introduction of double meat sandwiches in March 2006 constitutes a substantial change in the competitive circumstances of Plaintiffs and Class members, requiring written notice and "good cause" within the meaning of the WFDL;

(l)     Whether Quiznos' coupon practices constitute a substantial change in the competitive circumstances of Plaintiffs and Class members, requiring written notice and "good cause" within the meaning of the WFDL;

(m)     Whether Defendants' affirmative statements and material omissions constitute intentional fraud;

(n)     Whether Quiznos' UFOC contained fraudulent misrepresentations and omissions;

(o)     Whether Quiznos breached the terms of the agreement contained in the UFOCs;

(p)     Whether Plaintiffs sustained injury as a result of Quiznos' breaches of the Franchise Agreement;

(q)     Whether Plaintiffs and Class members are entitled to recover compensatory, exemplary, trebled, statutory or punitive damages based on Defendants' fraudulent, illegal, anticompetitive conduct or practices and/or otherwise;

(r)     Whether Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

77.     **Typicality**:  Plaintiffs are members of the Class.  Plaintiffs' claims have a common origin and share common bases.  Their claims originate from the same illegal, fraudulent and confiscatory practices of the Defendants, and the Defendants act in the same way

toward the Plaintiffs and the Class members. If brought and prosecuted individually, the claims

of each Class member would necessarily require proof of the same material and substantive

facts, rely upon the same remedial theories, and seek the same relief.

78. **Adequacy**: Plaintiffs are adequate representatives of the Class because their

interests do not conflict with the interests of the members of the Class they seek to represent.

Plaintiffs have retained competent counsel, and intend to prosecute this action vigorously.

Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class.

**Rule 23(b)(2) and (3)**

79. This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil

Procedure 23(b)(2) because Plaintiffs and the Class seek declaratory and injunctive relief, and all

of the above factors of numerosity, common questions of fact and law, typicality and adequacy

are present. Moreover, Defendant has acted on grounds generally applicable to Plaintiffs and the

Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable

remedies.

80. This lawsuit may be maintained as a class action under Federal Rule of Civil

Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the

questions affecting only individual members of the Class, and a class action is superior to other

available means for the fair and efficient adjudication of this dispute. The damages suffered by

each individual class member may be disproportionate to the burden and expense of individual

prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices.

Additionally, effective redress for each and every class member against Defendants may be

limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from

these disputes. Even if individual class members could afford or justify the prosecution of their

separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against Defendants.

**FIRST CLAIM FOR RELIEF**
**CIVIL RICO (18 U.S.C. § 1962(C))**
**(FRAUDULENT SCHEME TO SELL**
**ESSENTIAL GOODS AT INFLATED PRICES)**
**ON BEHALF OF ALL PLAINTIFFS**

81.    Plaintiffs reallege Paragraphs 1 through 80 of this Complaint as if set forth in full.

82.    Defendants QFII, QFA, TQSC, Cervantes, Rick Schaden and Dick Schaden have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

83.    The Quiznos franchise system, which is comprised of defendants QFII, QFA, TQSC,  TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4).

84.    Defendant QFII participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known  to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.  Defendants further gained control over franchisees by sanctioning unreasonable loan and financing arrangements for inflated prices for store establishment that could not be reasonably repaid by the average Quiznos store's cash flow, placing Plaintiffs in submissive positions for fear of losing their only cash flow and facing imminent bankruptcy.

85.     Defendant QFA participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

86.     To the extent that rights to enforce and apply the franchise agreements of the Plaintiffs have in fact been delegated to defendant TQSC, defendant TQSC has participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

87.     Defendant Cervantes has participated in the conduct of the enterprise by its provision of products and services to the Plaintiffs through its affiliates.

88.     Defendants Rick Schaden and Dick Schaden have participated in the affairs of the enterprise by virtue of their positions as officers and/or directors of defendants QFII, QFA and TQSC, in which positions, upon information and belief, they either made or approved decisions to knowingly overcharge Plaintiffs for products, services and materials which Plaintiffs were required to buy in order to operate their franchises, and to require Plaintiffs to purchase products, services and materials from approved vendors whose prices to franchisees were known by Dick Schaden and Rick Schaden to be inflated beyond fair market value because of kickbacks that the

approved vendors were required to pay one or more Quiznos entities in order to become approved vendors.

89.     The predicate crimes committed by defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by 18 U.S.C. § 1343.

90.     In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendant QFII devised and effected a scheme to defraud the Plaintiffs that have franchise agreements signed in and after February 2005, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

91.     The execution of the scheme to defraud by defendant QFII involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant QFII.

92.     Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendant's fraudulent scheme are as follows:  payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendant's fraudulent overcharging practices.

93.     In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendant QFA devised and effected a scheme to defraud the Plaintiffs that have franchise agreements signed prior to February 2005, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

94.     The execution of the scheme to defraud by defendant QFA involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant QFA.

95.     Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendant's fraudulent scheme are as follows:  payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendant's fraudulent overcharging practices.

96.     To the extent that the franchisor's rights under Plaintiffs' franchise agreements have been delegated to defendant TQSC, defendant TQSC devised and effected a scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly

from a Quiznos-controlled entity) or deliberately and knowingly causing the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

97. The execution of the scheme to defraud by defendant TQSC involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant TQSC.

98. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendant's fraudulent scheme are as follows: payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendant's fraudulent overcharging practices.

99. The predicate acts committed by defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

100. The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the same victims of money each time a fraudulently inflated price is charged to the franchisee and received, in the form of a direct payment to Quiznos or a kickback paid to Quiznos by an approved supplier, by Quiznos or an affiliated entity. In addition, all of the

Quiznos franchisees across the United States, current and past, have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

101.     The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because the practice of fraudulently overcharging the Quiznos franchisees for products, services and materials they must purchase in order to operate their stores is a crucial means by which Quiznos maintains its high revenues and profits.  Indeed, the scheme is likely to continue on its present course until Quizno's existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

102.     Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein, and more specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

**SECOND CLAIM FOR RELIEF**
**CIVIL RICO (18 U.S.C. § 1962(C))**
**(FRAUDULENT SCHEME TO SELL**
**FRANCHISE AGREEMENTS)**
**ON BEHALF OF ALL PLAINTIFFS**

103.     Plaintiffs reallege Paragraphs 1 through 102 of their Complaint as if set forth in full.

104.     Defendants QFII, QFA, TQSC, Cervantes, Rick Schaden, Dick Schaden, Darin Tweten, Eric Tweten, Stu Brown and Eric Brown have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

105.     The Quiznos franchise system, which is comprised of defendants QFII, QFA, TQSC, TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and

materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4).

106.     Defendant QFII participated in the conduct of the enterprise through inducing the purchase of franchises by Plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

107.     Defendant QFA participated in the conduct of the enterprise through a pattern of racketeering activity.

108.     Defendant Cervantes has participated in the conduct of the enterprise by its provision of products and services to the Plaintiffs through its affiliates.

109.     Defendants Rick Schaden and Dick Schaden have participated in the affairs of the enterprise by virtue of their positions as officers and/or directors of defendants QFII, QFA and TQSC, in which positions, upon information and belief, they either made or approved decisions to knowingly induce franchise sales through misrepresentation and deceit.

110.     Defendants Darin Tweten, Eric Tweten, Stu Brown and Eric Brown participated for their own financial benefit in the affairs of the enterprise by knowingly making misrepresentations of fact to Plaintiffs and other prospective franchisees for the purpose of inducing them to purchase Quiznos franchises.

111.     The predicate crimes committed by defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by U.S.C. § 1343.

112.     In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendants devised and effected a scheme to defraud prospective franchisees by knowingly and deliberately making false

representations of fact, and/or omitting material true facts, to prospective franchises in order to induce them to purchase a Quiznos franchise.

113.   The execution of the scheme to defraud by defendants involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendants.

114.   Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendants fraudulent scheme are as follows: Uniform Franchise Offering Circulars and franchise agreements were distributed using the United States mails; defendants Darin Tweten, Eric Tweten, Stu Brown and Eric Brown made and received telephone calls to and from prospective franchisees in which further fraudulent representations and omissions were made in order to induce entry into franchise agreements; payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendants' fraudulent overcharging practices.

115.   Prior to Plaintiff Loeffler signing his Franchise Agreement, defendants TQFC, Darin Tweten and Eric Tweten made the following fraudulent statements and omissions with the intent to deceive Loeffler and ALJL Loeffler Enterprises, Inc. into signing the Franchise Agreement and operating a franchise for Quiznos:

(a)     Defendants failed to disclose that Darin Tweten and Eric Tweten had no food industry or restaurant experience prior to buying their territory from Quiznos;

(b)     In a UFOC presented to Plaintiff Loeffler by Darin Tweten and Eric Tweten in or about September 2000, TQFC deliberately understated the expenses of opening a Quiznos franchise;

(c)     Darin Tweten and Eric Tweten represented that Quiznos "doesn't believe" in coupons;

(d)     Defendants TQFC, Darin Tweten and Eric Tweten failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(e)     Defendants TQFC, Darin Tweten and Eric Tweten failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

116.     These representations and omissions made to Loeffler and ALJL Loeffler Enterprises, Inc. are extrinsic to Loeffler's Franchise Agreement.  Loeffler and ALJL Loeffler Enterprises, Inc. discovered these misrepresentations and omissions within the applicable statute of limitations.

117.     Prior to Plaintiff Gelvoria signing her Franchise Agreement, Defendants QF, Darin Tweten and Eric Tweten made the following fraudulent statements and omissions with the intent to deceive Gelvoria and Corona Ventures LLC into signing the Franchise Agreement and operating a franchise for Quiznos:

(a)    Defendants QF, Darin Tweten and Eric Tweten failed to disclose the true cost to Gelvoria of advertising, which ran between 9% and 11% by virtue of Quiznos' mandated excessive couponing, promotional offers, and food giveaways;

(b)    Defendants QF, Darin Tweten and Eric Tweten failed to disclose the true and accurate number of franchises that had closed and the number of franchises operating under second, third and even fourth-generation owners;

(c)    Defendants QF, Darin Tweten and Eric Tweten failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(d)    Defendants QF, Darin Tweten and Eric Tweten failed to disclose that food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that were actually received by a franchisee and available for her to utilize in operations.

118.    These representations and omissions made to Gelvoria and Corona Ventures LLC are extrinsic to Gelvoria's Franchise Agreement.  Gelvoria and Corona Ventures LLC discovered these misrepresentations and omissions within the applicable statute of limitations.

119.    Prior to Plaintiff Schleis signing his Franchise Agreement, Defendants TQFC, Eric Brown and Stu Brown made the following false and fraudulent statements and omissions with the intent to deceive Schleis and German Creek Subs, Inc. into signing the Franchise Agreement and operating a franchise for Quiznos:

(a)    On February 13, 2001 at the Rice Lake Quiznos, Eric Brown stated to Schleis that he would make $75,000 a year as a Quiznos franchisee;

(b)    On February 23, 2001, Eric Brown stated that there were "multiple locations ready to go in Menomonie and Chippewa Falls", implying that Quiznos franchises

were selling fast and therefore were highly desirable. In fact, all four locations discussed by Eric Brown were not "ready to go" and all fell through;

(c)     On March 16, 2001 at the Eau Claire Golf Road Quiznos, Eric Brown told Schleis that the 1% fee paid by franchisees for regional marketing would not be charged to Schleis because the market in the area was underdeveloped; in fact, Quiznos has charged this fee to Schleis since his store opened;

(d)     Defendants TQFC, Eric Brown and Stu Brown failed to disclose that franchise owners are not reimbursed for coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(e)     Defendants TQFC, Eric Brown and Stu Brown failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(f)     Defendants TQFC, Eric Brown and Stu Brown failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data which represented the revenues that would actually be received by a franchisee;

120.     These representations and omissions made to Schleis and German Creek Subs, Inc. are extrinsic to Schleis' Franchise Agreement. Schleis and German Creek Subs, Inc. discovered these misrepresentations and omissions within the applicable statute of limitations.

121.     Prior to Plaintiff Qubs, Inc. signing its Franchise Agreement, Defendants QF and Stu Brown made the following fraudulent statements and omissions with the intent to deceive Qubs, Inc. and the Manskes into signing the Franchise Agreement and operating a franchise for Quiznos:

(a)     Defendants QF and Stu Brown failed to disclose that franchise owners are not reimbursed for coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(b)     Defendants QF and Stu Brown failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c)     Defendants QF and Stu Brown failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data which represented the revenues that would actually be received by a franchisee;

(d)     Defendants QF and Stu Brown failed to disclose that the store purchased by Qubs, Inc. was rated "red" and in default;

(e)     Defendants QF and Stu Brown failed to tell Qubs, Inc. that Stuart Brown, the owner of the store they acquired and the Area Director responsible for the Manskes' store, was embroiled in litigation with Quiznos;

(f)     Defendants QF and Stu Brown failed to tell Qubs, Inc. that Eric Brown had been fired;

122.     These representations and omissions made to Qubs, Inc. and the Manskes are extrinsic to Qubs, Inc.'s Franchise Agreement. Qubs, Inc. and the Manskes discovered these misrepresentations and omissions within the applicable statute of limitations.

123.     Prior to Plaintiff Ten Pas signing his Franchise Agreements, Defendants QF, Darin Tweten and Eric Tweten made the following fraudulent statements and omissions with the intent to deceive Ten Pas and TenPas Enterprises LLC into signing the Franchise Agreements and operating franchises for Quiznos:

(a)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose that Quiznos had already entered into a franchise agreement for a store located in Kohler, only a few miles from the location of Ten Pas' franchise;

(b)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose that Darin Tweten and Eric Tweten had no food industry or restaurant experience prior to buying their territory for Quiznos;

(c)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose the true cost to Ten Pas of advertising, which ran between 9% and 11% by virtue of Quiznos' mandated excessive couponing, promotional offers, and food giveaways;

(d)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose the true and accurate number of franchises that had closed and the number of franchises operating under second, third and even fourth-generation owners;

(e)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(f)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose that food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that were actually received by a franchisee and available for him to utilize in operations.

124.    These representations and omissions made to Ten Pas and TenPas Enterprises LLC are extrinsic to Ten Pas' Franchise Agreements. Ten Pas and TenPas Enterprises LLC discovered these misrepresentations and omissions within the applicable statute of limitations.

125.    Prior to Plaintiff Schwaegel signing his Franchise Agreement, Defendants QF, Eric Brown and Stu Brown made the following false and fraudulent statements and omissions

with the intent to deceive Schwaegel and Maurelly-Rae's LLC into signing the Franchise Agreement and operating a franchise for Quiznos:

       (a)    Defendants QF, Eric Brown and Stu Brown failed to disclose that Quiznos does not reimburse franchise owners for coupons, promotional offers, and other discounts, thus concealing the true cost of operating a franchise;

       (b)    Defendants QF, Eric Brown and Stu Brown failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, and services, other materials that must be purchased from Quiznos or its approved suppliers;

       (c)    Defendants QF, Eric Brown and Stu Brown failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

126.    These representations and omissions made to Schwaegel and Maurelly-Rae's LLC are extrinsic to Schwaegel's Franchise Agreement. Schwaegel and Maurelly-Rae's LLC discovered these misrepresentations and omissions within the applicable statute of limitations.

127.    Prior to Plaintiff American Edge II, Inc. signing its Franchise Agreements, Defendants QF, Stu Brown and Eric Brown made the following representations and omissions with the intent to deceive American Edge II, Inc. and Maul into signing the Franchise Agreements and operating franchises for Quiznos:

       (a)    Defendants QF, Stu Brown and Eric Brown failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

(b)     Defendants QF, Stu Brown and Eric Brown failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c)     Defendants QF, Stu Brown and Eric Brown failed to disclose that franchise owners are not reimbursed for coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

128.    These representations and omissions made to American Edge II, Inc. and Maul are extrinsic to American Edge II, Inc.'s  Franchise Agreements.  American Edge II, Inc. and Maul discovered these misrepresentations and omissions within the applicable statute of limitations.

129.    Prior to the Westerfields and Quizwiz LLC signing their Franchise Agreements, Defendants QF, Darin Tweten and Eric Tweten made the following representations and omissions with the intent to deceive them into signing their Franchise Agreements and operating franchises for Quiznos:

(a)     Darin Tweten and Eric Tweten stated at an informational meeting for prospective franchisees that franchisees could expect to make an average annual profit of $60,000 per store;

(b)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchise;

(c)     Defendants QF, Darin Tweten and Eric Tweten failed to disclose that Quiznos does not reimburse franchise owners for coupons, promotional offers, and other discounts, thus concealing the true cost to operating a franchise;

(d) Defendants QF, Darin Tweten and Eric Tweten failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers.

130. These representations and omissions made to the Westerfields and Quizwiz LLC are extrinsic to their Franchise Agreements. The Westerfields and Quizwiz LLC discovered these misrepresentations and omissions within the applicable statute of limitations.

131. Prior to Harris & Harris LLC signing its Franchise Agreement, Defendants QF, Darin Tweten and Eric Tweten made the following representations and omissions with the intent to deceive Harris & Harris LLC, William Harris, and Anthony Harris into signing the Franchise Agreement and operating a franchise for Quiznos:

(a) Defendants QF, Darin Tweten and Eric Tweten failed to disclose that franchise owners are not reimbursed for coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(b) Defendants QF, Darin Tweten and Eric Tweten failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c) Defendants QF, Darin Tweten and Eric Tweten failed to disclose that the foods costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee.

132. These representations and omissions made to Harris & Harris LLC, William Harris and Anthony Harris are extrinsic to Harris & Harris LLC's Franchise Agreement. Harris & Harris LLC, William Harris, and Anthony Harris discovered these misrepresentations and omissions within the applicable statute of limitations.

133. Prior to Plaintiff Knutson signing her Franchise Agreement, Defendants QF, Eric Brown and Stu Brown made the following fraudulent statements and omissions with the intent to deceive Knutson and LWL, Inc. into signing the Franchise Agreement and operating a franchise for Quiznos:

(a) Defendants QF, Eric Brown and Stu Brown failed to disclose that Quiznos does not reimburse franchise owners for coupons, promotional offers, and other discounts, thus concealing the true cost of operating a franchise;

(b) Defendants QF, Eric Brown and Stu Brown failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c) Defendants QF, Eric Brown and Stu Brown failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represent the revenues that would actually be received by a franchisee.

134. These representations and omissions made to Knutson and LWL, Inc. are extrinsic to Knutson's Franchise Agreement. Knutson and LWL, Inc. discovered these misrepresentations and omissions within the applicable statute of limitations.

135. Prior to Plaintiff Hanif signing his Franchise Agreement, Defendants QF, Eric Tweten and Darin Tweten made the following representations and omissions with the intent to deceive Hanif and H&N LLC into signing the Franchise Agreement and operating a franchise for Quiznos:

(a) Defendants QF, Eric Tweten and Darin Tweten failed to disclose that franchise owners are not reimbursed for coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(b)     Defendants QF, Eric Tweten and Darin Tweten failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

(c)     Defendants QF, Eric Tweten and Darin Tweten failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(d)     Defendants Darin Tweten and Eric Tweten represented that food costs would become appreciably lower once Quiznos had opened 3,000 stores due to Quiznos larger purchasing power.

136.     These representations and omissions made to Hanif H&N LLC are extrinsic to Hanif's Franchise Agreement.  Hanif and H&N LLC discovered these misrepresentations and omissions within the applicable statute of limitations.

137.     Prior to the Schodrons signing their Franchise Agreement, Defendants QF, Eric Tweten and Darin Tweten made the following fraudulent statements and omissions with the intent to deceive the Schodrons and Schodron Enterprises LLC into signing the Franchise Agreement and operating a franchise for Quiznos:

(a)     Defendants QF, Eric Tweten and Darin Tweten failed to disclose that Quiznos does not reimburse franchise owners for coupons, promotional offers, and other discounts, thus concealing the true cost of operating a franchise;

(b)     Defendants QF, Eric Tweten and Darin Tweten failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

(c)     Defendants TQFC, Eric Tweten and Darin Tweten failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers.

138.     These representations and omissions made to the Schodrons and Schodron Enterprises LLC are extrinsic to the Schodrons' Franchise Agreement.  The Schodrons and Schodron Enterprises LLC discovered these misrepresentations and omissions within the applicable statute of limitations.

139.     The predicate acts committed by defendants as alleged herein constitute a "pattern of racketeering activity: within the meaning of 18 U.S.C. § 1961(5).

140.     The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the franchisees through their payment of the initial franchise fee, as well as other future payments to be received by Quiznos, such as for overpriced products, services, materials and the like.  In addition, all of the Quiznos franchisees across the United States have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

141.     The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because Quiznos' business model is built upon continually increasing the number of new franchises coming into the system.  Indeed, the scheme is likely to continue on its present course until Quiznos' existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

142.     Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein.

# THIRD CLAIM FOR RELIEF
## ILLEGAL TYING UNDER § 1 OF THE SHERMAN ACT
## ON BEHALF OF ALL PLAINTIFFS

143. Plaintiffs reallege Paragraphs 1 through 142 of this Complaint as if set forth in full.

144. There exists a market for ownership interests in Quick Service Toasted Sandwich Restaurant Franchises, in which Quiznos maintains substantial market power. Quiznos maintains over 4,000 shops in the United States. It is one of the dominant players in the sandwich and bakery franchise category, and is the top ranked sandwich chain by sales growth in the United States.

145. A separate market exists for the related goods and services associated with the operation of a Quick Service Toasted Sandwich Restaurant Franchises, including raw materials, services and food products (referred to throughout this Complaint as "Essential Goods").

146. Quiznos affiliates, including entities in which it maintains a financial or other ownership interest, as well as approved vendors from which it receives contractual kickbacks, are the sole sources from which Plaintiffs and the Class may purchase Essential Goods. As a practical matter, Quiznos will not approve suppliers who do not agree to pay kickbacks to Quiznos or affiliated entities as a condition of obtaining such approval.

147. Quiznos conceals the nature of its relationships with its affiliates and approved vendors from potential franchisees including Plaintiffs and the Class members, in order to lock them into onerous franchise agreements and create excessive switching costs.

148. At all times Quiznos and its affiliates had monopoly power, market power and/or economic power in the relevant Quick Service Toasted Sandwich Restaurant Franchises market, sufficient to force Plaintiffs and the Class to purchase and accept Essential Goods from Quiznos-affiliated vendors.

149.    By reason of the terms of the franchise agreements and the investments the franchisees have made in their franchises, Quiznos has substantial power in the market for both Quick Service Toasted Sandwich Restaurant Franchises and the market for Essential Goods.

150.    Quiznos manipulates its economic power in the Quick Service Toasted Sandwich Restaurant Franchises market to coerce Plaintiffs and the Class to purchase essential goods solely from its affiliates, through contractual provisions contained in franchise agreements, as well as exploitation of pre-contractual information deficiencies and post-contractual switching costs.   Through these and other means, Quiznos can and does coerce franchisees to purchase nearly all of the products, services and materials they need from Quiznos itself or from approved vendors designated and controlled by Quiznos and its affiliates.

151.    Through the exercise of Quiznos' economic power as alleged herein, Quiznos has conditioned the purchase by Plaintiffs of their franchises and their continued existence as franchisees upon their purchase of Essential Goods from Quiznos itself or from approved vendors in which it maintains a financial interest.

152.    As a direct and proximate result of Defendants' anticompetitive tying activity, Plaintiffs and the Class have been injured by being forced to pay supra-competitive prices for Essential Goods.

153.    A substantial amount of interstate commerce in Essential Goods needed to operate a Quiznos franchise has been adversely affected and Quiznos' practices impose an unreasonable negative effect on competition in the marketplace, because Quiznos' policy of coercing and conditioning the purchase and operation of a franchise and the purchase by franchisees of Essential Goods forecloses the ability of vendors unwilling to pay kickbacks to Quiznos and its affiliated entities from selling their products, services and materials to the Plaintiffs, even though

the quality of such products, services and materials is equal to if not better than the quality of what is supplied by Quiznos-approved vendors.

154.    Quiznos' tie of its franchises to products, services and materials from approved suppliers imposes an unreasonable restraint upon commerce and is therefore *per se* unlawful and in violation of Section One of the Sherman Act, 15 U.S.C § 1, and has caused damage to the Plaintiffs and the Class.

155.    Alternatively, if Quizno's tying conduct is not *per se* unlawful, it is unlawful under the rule of reason, in that the anticompetitive consequences of defendants' conduct outweigh any pro-competitive effects thereof.  Not only does Quiznos' conduct impose supra-competitive prices on Plaintiffs and the Class, it impedes the ability of other suppliers to engage in competition with Quiznos' affiliates and vendors to provide higher quality raw materials, services and food products at lower costs.  Moreover, consumers are injured in that they are forced to indirectly pay the kickbacks and excessive prices for product charged to franchises by Quiznos' affiliates and vendors.  There is no pro-business or efficiency justification for the kickbacks and supra-competitive pricing, nor does any legitimate business purpose require these practices.

156.    By reason of the illegal conduct of Quiznos as alleged herein, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial and then trebled pursuant to 15 U.S.C. § 15, and to permanent injunctive relief prohibiting Quiznos' unlawful tying conduct.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE WISCONSIN ANTITRUST ACT
### ON BEHALF OF ALL PLAINTIFFS

157.    Plaintiffs reallege Paragraphs 1 through 156 of this Complaint as if set forth in full.

158.     The aforementioned practices of Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. Ch. 133.

159.     As a result of the conduct described above, Plaintiffs and the Class have sustained and will continue to sustain substantial losses and damage to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were forced to pay as part of Defendants' unlawful and anticompetitive conduct.  The full amount of such damages are presently unknown and will be determined after discovery and upon proof at trial

160.     Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF THE WISCONSIN FAIR DEALERSHIP LAW
## ON BEHALF OF ALL PLAINTIFFS EXCEPT RICK TEN PAS

161.     Plaintiffs reallege Paragraphs 1 through 160 of this Complaint as if set forth in full.

162.     Plaintiffs are "dealers," and Quiznos is a "grantor," within the meaning of the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. Ch. 135.

163.     As a result of the actions of Quiznos as alleged herein, Plaintiffs' franchised restaurants have consistently operated on razor-thin profit margins, when they have been profitable at all.  Quiznos is well aware that the Plaintiffs' businesses are teetering on the brink of insolvency.  As a result of the precarious financial condition of Plaintiffs' restaurants, Plaintiffs' dealerships are particularly vulnerable to changes in operations unilaterally dictated by Quiznos that have the effect of increasing Plaintiffs' costs of operation or decreasing their operating revenues.

164.     Quiznos introduced double meat sandwiches in July 2005 (Double Angus),
February 2006 (Prime Rib Peppercorn), April 2006 (Double Stack Pastrami), July 2006 (BBQ
Brisket), August 2006 (Cheesesteak) and October 2006 (Ultimate Italian).  Each of these
sandwiches results in franchisees' experiencing food costs of between 35% to 47.65% on these
products, as compared to the Quiznos' fraudulent business model that sets a food cost target of
28.5%, resulting in a marked decrease in franchisees' ability to profit from selling these double-
portion sandwiches.  As a result, the introduction of each of these sandwiches as menu items
effected a substantial change in the competitive circumstances of Plaintiffs.  Because each
change was implemented by Quiznos without giving Plaintiffs 90 days prior written notice and
without "good cause" within the meaning of the WFDL, the introduction of each of these
products violated the WFDL.

165.     In December 2005 and January 2006 Quiznos ran newspaper coupons offering the
public "buy one get one free" ("BOGO") sandwiches.  Although the coupons stated they could
be redeemed "at participating locations" Quiznos required Plaintiffs to participate in the
program.  Because Quiznos does not reimburse its franchisees at all for coupon redemptions, the
effect of this promotion was to require franchisees effectively to provide free food to customers
at their sole cost and expense, resulting in reduced profit margins for the duration of the
promotion, and effecting a substantial change in the competitive circumstances of Plaintiffs.
Because the BOGO couponing was implemented by Quiznos without giving Plaintiffs 90 days
prior written notice and without "good cause" within the meaning of the WFDL, the BOGO
couponing program violated the WFDL.

166.     In February 2006 Quiznos required Plaintiffs to offer kids' meals on weekends at
a cost of 99 cents to those customers who purchased a "toasty combo," even though the cost of
each kid's meal was approximately $1.50.  Each kid's meal sold thus resulted in a net loss to

Plaintiffs who were not reimbursed by Quiznos, and the program effected a substantial change in the competitive circumstances of the Plaintiffs. Because the kids' meal program was implemented by Quiznos without giving Plaintiffs 90 days prior written notice and without "good cause" within the meaning of the WFDL, the kids' meal promotion violated the WFDL.

167. In January 2006 Quiznos required Plaintiffs to participate in a "25th Anniversary Celebration" promotion of the Quiznos franchise system in which customers were given peel-off cards that would allow them to purchase a small sandwich, a small soda, a bag of chips or a cookie for 25 cents. This price was not sufficient to cover the cost of any of the items subject to the promotion, and in the case of the small sandwiches the cost greatly exceeded the 25-cent price, effecting a substantial change in the Plaintiffs' competitive circumstances. Because the 25th Anniversary Celebration promotion was implemented by Quiznos without 90 days prior written notice and without "good cause" within the meaning of the WFDL, the promotion violated the WFDL.

168. Alternatively, even if any of the foregoing, standing alone, does not as a matter of law constitute a substantial change in competitive circumstances, the cumulative negative financial effect of the couponing and the double meat sandwich changes imposed between December 2005 and July 2006 effected a substantial change in the competitive circumstances of Plaintiffs, which change was imposed by Quiznos without notice and good cause, in violation of the WFDL.

169. By reason of Quiznos' violations of the WFDL as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
## INTENTIONAL FRAUD
## (FRAUD IN THE INDUCEMENT)
## ON BEHALF OF ALL PLAINTIFFS

170.    Plaintiffs reallege Paragraphs 1 through 169 of this Complaint as if set forth in full.

171.    As alleged with specificity in Paragraphs 115 through 138 of this Complaint, defendants knowingly made false statements of fact to, and omitted or concealed true statements of fact from the Plaintiffs.  With respect to each such true statement alleged to have been omitted or concealed by the defendants, the defendants owed each Plaintiff a duty to disclose the truth of such omitted or concealed fact.

172.    The statements and omissions of the defendants as alleged herein were untrue.

173.    Defendants knew or should have known that their affirmative statements as alleged herein were false, and that their omissions or concealments were deceptive by virtue of being incomplete.

174.    The defendants made the false statements, and engaged in the omissions and concealments, with the intent to defraud the Plaintiffs and in order to induce the Plaintiffs to rely on the statements, omissions and concealments.

175.    Each Plaintiff believed the false statements made to him or her, or believed that no facts existed inconsistent with defendants' omissions and concealments, and acted in reliance upon those beliefs to his or her detriment.

176.    As a result of their detrimental reliance on defendants' fraudulent statements and omissions, Plaintiffs and the Class have been damaged in the future in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT
## WIS. STAT. § 100.18
## ONLY AS TO THE MANSKES, QUBS, INC. THE WESTERFIELDS, QUIZWIZ LLC, GELVORIA AND CORONA VENTURES LLC

177.    Plaintiffs reallege Paragraphs 1 through 176 of this Complaint as if set forth in full.

178.    The conduct described in this Complaint constitutes a violation of Wis. Stat. § 100.18 *et seq.*

179.    The Manskes, Qubs, Inc., the Westerfields, Quizwiz LLC, Gelvoria, Corona Ventures LLC, and all members of the Class similarly situated, have been injured as a result of Defendants' false and deceptive trade practices, including the misrepresentations, deceptions and omissions described in this Complaint as a result of being induced to execute their respective franchise agreements and operate Quiznos franchises.

180.    As a result of these statutory violations, the Manskes, Qubs, Inc., the Westerfields, Quizwiz LLC, Gelvoria, Corona Ventures LLC, and all members of the Class similarly situated, are entitled to receive equitable relief, in such form as the Court may deem appropriate, pecuniary damages, costs, and attorneys fees as prescribed by Wis. Stat. § 100.18 *et seq.*

## EIGHTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
## AS TO ALL PLAINTIFFS WHO EXECUTED FRANCHISE AGREEMENTS

181.    Plaintiffs reallege Paragraphs 1 through 180 of this Complaint as if set forth in full.

182.    The UFOCs presented to Plaintiffs represented that Quiznos would "negotiate purchase agreements with suppliers for the benefit of Franchisees." Pursuant to the terms of

each Plaintiff's franchise agreement, the representations of Quiznos in the UFOC are made part of each franchise agreement between the parties.

183.    By using its control over the suppliers from whom Quiznos allows franchisees to purchase products, services and materials to increase its own revenues through its kickback scheme, and by failing to use its "market power" due to volume purchases for the benefit of franchisees, Quiznos has breached its promise to negotiate with suppliers for the benefit of franchisees.

184.    Quiznos has further breached its contractual obligations to Plaintiffs and the Class as follows:  (a) failing to provide promised support and assistance in operating franchises; (b) failing to properly appropriate advertising funds; (c) failing to disclose the relationships it has with approved vendors, including the kickbacks it receives from them; and (d) misusing the marketing funds paid by Plaintiffs and the Class for purposes prohibited by the Franchise Agreement.

185.    As a proximate result of Quiznos' breaches of contract as alleged herein, Plaintiffs and the Class have been damaged in amounts to be proven at trial.

## FRAUDULENT CONCEALMENT

186.    Plaintiffs reallege Paragraphs 1 through 185 of this Complaint as if set forth in full.

187.    Throughout the implementation of their fraud and continuing until the present day, Defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing Plaintiffs and the Class from becoming aware of their rights and dissuading them from pursuing legal action to vindicate those rights.

188.    Defendants actively concealed information necessary for Plaintiffs and the Class to discover the existences of their causes of action.

189.     Plaintiffs and the Class relied on the Defendants' actions and/or omissions in failing to discover the factual and legal basis of their claims.

190.     As a result of Defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, Plaintiffs and the Class did not know, and could not know in the exercise of reasonable diligence, the basis of their claims.

191.     Accordingly, Defendants are estopped from raising affirmative defenses relying upon any statutes of limitations or contractual limitations periods otherwise applicable to the claims asserted herein by Plaintiffs.

WHEREFORE, Plaintiffs respectfully request the following relief:

(a)     An Order certifying the proposed Class herein and appointing Plaintiffs and the undersigned counsel of record to represent the Class;

(b)     An Order issuing a preliminary injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(c)     An Order issuing a permanent injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(d)     A Judgment awarding Plaintiffs compensatory, consequential and statutory damages;

(e)     A Judgment awarding Plaintiffs exemplary, punitive and treble damages;

(f)     Such other relief as the Court deems just and equitable.

Dated this 20th day of November, 2006.

WHYTE HIRSCHBOECK DUDEK S.C.
Attorneys for Plaintiffs


s/Mark M. Leitner
_____
Mark M. Leitner
Joseph S. Goode

555 East Wells Street
Suite 1900
Milwaukee, WI 53202
Telephone:  (414) 273-2100
Fax:  (414) 223-5000

Direct Inquires to:  Mark M. Leitner

<u>Of Counsel</u>:
Justin M. Klein
Marks & Klein, LLP
63 Riverside Avenue
Red Bank NJ 07701
Telephone:  (732) 747-7100
Fax:  (732) 219-0625

**PLAINTIFFS DEMAND A JURY**