# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

FRED and MICHANA WESTERFIELD, et al.,,

        Plaintiffs,

v.                             Case No. 06-C-1210

THE QUIZNO'S FRANCHISE
COMPANY, LLC, et al.,

        Defendants.

---

## MEMORANDUM AND ORDER

---

Quizno's is the trade name for chain of fast-food restaurants known for their toasted submarine sandwiches. On November 20, 2006, twelve Wisconsin Quizno's franchisees brought this class action against The Quizno's Franchise Company LLC and related entities, two of its officers (hereinafter collectively Quizno's), and four of its Wisconsin Area Directors. Plaintiffs allege that Quizno's engaged in an illegal business scheme in which it "fraudulently induced plaintiffs and the Class to purchase franchises and thereafter exploited their control and economic power in order to extract exorbitant and unjustifiable payments from their franchisees." (Compl. ¶1.) The fifty-six-page, one-hundred-ninety-one-paragraph, complaint asserts claims against the defendants for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), the Sherman Act, the Wisconsin Anti-Trust Act, the Wisconsin Fair Dealership Law, the Wisconsin Deceptive Trade Practices Act, and common law claims for fraud and breach of contract. Plaintiffs seek certification as a class action, preliminary and permanent injunctive relief, and statutory, compensatory and punitive damages. Federal jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1367.

Referring to their current relationship with their franchisor, plaintiffs state that for them, "Quizno's advertising slogan "Get Toasted" had taken on a new and unhappy meaning." (Br. In Opp. at 1.) Quiznos, on the other hand, has responded to plaintiffs' lawsuit with the legal equivalent of another fast food restaurant's advertizing slogan: "Where's the beef?" It has filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Arguing that each of the plaintiffs' claims "is conclusively gutted by the explicit disclosures each plaintiff received, the express terms of the Franchise Agreement, and each plaintiff's acknowledgment of the risk associated with his business and disclaimer of the very sort of purported representations alleged in the complaint," Quiznos urges that the complaint be dismissed.

Having considered fully the arguments of counsel, I conclude that claims of fraud on which plaintiffs' civil RICO claims rest are fatally undermined by the exhaustive disclosures and specific disclaimers and non-reliance clauses set forth in the franchise agreements they signed. I also conclude that the complaint fails to state a claim under the Sherman Act and its Wisconsin equivalent. With plaintiffs' federal claims gone, I then dismiss the remaining state law claims without prejudice to allow plaintiffs to pursue them in state court under whose law they arise.

**A. Rule 12(b)(6) Motion To Dismiss Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss under Rule 12(b)(6), a court views all of the facts alleged in the complaint, as well as any inferences reasonably drawn from them, in the light most favorable to the plaintiff. *Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir. 1991). In general, "[t]he federal rules require ... only that

2

the complaint state a claim, not that it plead the facts that if true would establish (subject to any defenses) that the claim was valid." *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002). All that need be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 863 (7th Cir.2002). As the appellate courts have consistently reminded us, plaintiffs "don't have to file long complaints, don't have to plead facts, don't have to plead legal theories." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir.1999).

A critical exception to this general rule of notice pleading exists for claims of fraud and other claims sounding in fraud. *Bosellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Rule 9(b) of the Federal Rules of Civil Procedure provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This heightened pleading requirement is a response to the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Id.* (*citing Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir.1999). A complaint alleging fraud must provide "the who, what, when, where, and how." *Id.* (*quoting DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)).

In addition to this explicit heightened pleading standard in cases of fraud, the Supreme Court has recently explained that in the anti-trust context, Rule 8(a)'s general requirement for a "plain statement" of the claim means "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). Noting the high cost of discovery in anti-trust litigation, the Court held that in this area a complaint must set forth sufficient facts to show plausible grounds exist for believing a violation has occurred. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff claiming an anti-trust violation must allege

"enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* And in *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 473 (7th Cir. 2007), the Seventh Circuit applied the same pleading standard to a civil RICO claim.

Finally, also critical to the motion filed in this case is the rule that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). "[T]o the extent that the terms of an attached contract conflict with the allegations of the complaint, the contract controls. *Center v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir.2002) ("The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material.").

With these principles in mind, I proceed to consideration of plaintiffs' federal claims.


**B. Fraud In The Inducement and Civil RICO Claims**

Plaintiffs assert a claim of fraud in the inducement and two claims under RICO predicated on allegations of mail and/or wire fraud. Plaintiffs allege that the defendants first conducted the affairs of the Quiznos franchise system, an "association in fact" enterprise, so as to "fraudulently and deceptively induce them to purchase Quiznos franchises by intentionally misrepresenting the true nature of the contractual relationship as well as the financial prospects for the franchise and the likelihood of success." (Compl. ¶ 2.) Although some of the plaintiffs allege that Quiznos, through its Area Directors, made certain oral misrepresentations concerning such matters as the future

4

profitability of the franchises, the fraudulent inducement RICO claim is primarily based on what plaintiffs claim they were not told. All of the plaintiffs claim that Quiznos fraudulently withheld information it was required to disclose. For example, each of the plaintiffs claims that the defendants failed to disclose "the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers." (Comp. ¶¶ 115(d), 117(c), 119(e), 121(b), 123(e), 125(b), 127(b), 129(d), 131(b), 133(b), 135(c), 137(c)).

As a second RICO violation, plaintiffs claim that once they became franchisees, the Quiznos defendants "exploited their control and economic power in order to extract exorbitant and unjustifiable payments from their franchisees." (Compl. ¶ 1.) Under the terms of the franchise agreements, plaintiffs were required to purchase products, services and materials from suppliers that were either affiliated with or approved by Quiznos. Plaintiffs allege that they were overcharged for the products, services and materials they were required to purchase in order to operate their restaurants and that Quiznos profited from the excess payments either directly when the supplier was one of its affiliated companies, or indirectly in the form of "kickbacks" from its approved suppliers. Plaintiffs allege that both schemes – the scheme to fraudulently induce individuals to purchase franchises, and the scheme to fraudulently extract from franchisees exorbitant payments for essential goods and services, were carried out through the use of the United States mail and interstate wire facilities – thus making them actionable under RICO as a violation of 18 U.S.C. § 1962(c).

The problem with plaintiffs' claims of fraud, however, is that they are fatally undermined by the express disclosures, disclaimers and non-reliance clauses contained in both the Uniform Franchise Offering Circular (UFOC) that each plaintiff received and the Franchise Agreement that each plaintiff

signed.[1] Regarding the scheme to fraudulently induce plaintiffs to buy the franchises, for example, the complaint alleges that several plaintiffs relied on oral representations by Area Directors as to the average profit they could expect or the expenses they would incur. (Compl. ¶¶ 119, 129, 135.) But the UFOC each plaintiff received before entering into the agreement expressly stated:

> OTHER THAN THE ABOVE INFORMATION, WE DO NOT FURNISH OR AUTHORIZE OUR SALESPERSONS TO FURNISH ANY ORAL OR WRITTEN INFORMATION CONCERNING THE ACTUAL OR POTENTIAL SALES, INCOME OR PROFITS OF A QUIZNO'S RESTAURANT.

(Ex. B at 53-54) (capitalization in original). Even as to figures that were provided by Quiznos in writing, the UFOC warned:

> YOUR ACTUAL FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED. THE AVERAGE GROSS SALES FIGURES PRESENTED ABOVE REPRESENT SALES BEFORE DEDUCTIONS FOR CONTINUING ADVERTISING AND ROYALTY FEES PAYABLE TO THE FRANCHISOR AND ALL OTHER OPERATING EXPENSES. SEE ITEMS 6 AND 7 OF THIS OFFERING CIRCULAR FOR A PARTIAL LIST OF EXPENSES YOU WILL INCUR.

> THE SALES FIGURES ABOVE ARE AVERAGES OF HISTORICAL DATA OF SPECIFIC FRANCHISES. THEY SHOULD NOT BE CONSIDERED AS POTENTIAL SALES THAT MAY BE REALIZED BY YOU. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ACHIEVE THESE SALES LEVELS. ACTUAL RESULTS VARY FROM RESTAURANT TO RESTAURANT, AND WE CANNOT ESTIMATE THE RESULTS OF ANY PARTICULAR FRANCHISE.

> SUBSTANTIATION OF THE ABOVE AVERAGES IS AVAILABLE TO YOU AT OUR OFFICES IF YOU REQUEST, PROVIDED IT DOES NOT REQUIRE

---

[1] Quiznos initially submitted only representative samples of the UFOCs and franchise agreements that each of the plaintiffs received and signed. In response to Plaintiffs' suggestion that the court should deny its motion unless copies of the actual UFOC received by each plaintiff, as well as the Franchise Agreement each plaintiff signed, were submitted, Quiznos supplemented the record with the actual UFOC's the individual plaintiffs received and the Franchise Agreements they signed. The Court agrees that the relevant provisions are substantially identical and will refer only to the copies initially submitted.

THE DISCLOSURE OF THE IDENTITY OF ANY RESTAURANT OWNER.

(*Id.*)

In addition to the disclaimers in the UFOC, the Franchise Agreement each plaintiff signed contained an integration provision that read:

> This Agreement contains the entire agreement between the parties and supercedes any and all prior agreements concerning its subject matter. Franchisee agrees and understands that Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution of this Agreement or for claims of negligent or fraudulent misrepresentation, and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor or its affiliates regarding projected sales volumes, market potential, revenues, profits fo Franchisee's Restaurant or operational assistance other than as stated in this Agreement or in any disclosure document provided by the Franchisor or its representatives. ...

(Ex. A. § 23.2.) At the end of the Franchise Agreement, just over the parties' signatures, the following acknowledgments appeared:

> 23.12 **Acknowledgment.** BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL. FRANCHISEE ACKNOWLEDGES THAT:
>
> (A) THE SUCCESS OF THIS BUSINESS VENTURE INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND
>
> (B) NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND
>
> (C) NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT AND ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE, IS BINDING ON THE FRANCHISEE IN CONNECTION WITH THE SUBJECT MATTER OF

7

THIS AGREEMENT.

(Ex. A. § 23.12) (capitalization in original). Finally, at the time each franchisee signed the Franchise Agreement, they were asked to sign a "Disclosure Acknowledgment Statement," in which they again acknowledged that:

1.      The Franchisee recognizes and understands that business risks, which exist in connection with the purchase of any business, make the success or failure of the franchise subject to many variables, including, among other things, the skills and abilities of the Franchisee, the hours worked by the Franchisee, competition, interest rates, the economy, inflation, Restaurant location, operation costs, lease terms and costs and the market place.  The Franchisee hereby acknowledges its awareness of and willingness to undertake these business risks.

2.      The Franchisee acknowledges receipt of the Franchisor's Uniform Franchise Offering Circular and Exhibits (collectively, the "UFOC").  The Franchisee acknowledges that it has had the opportunity to personally and carefully review these documents.  Furthermore, the Franchisee has been advised to seek professional assistance, to have professionals review the documents and to consult with other franchisees regarding the risks associated with the purchase of the franchise.

3.      The Franchisee agrees and states that the decision to enter into this business risk is in no manner predicated upon any oral representations, assurances, warranties, guarantees or promises made by the Franchisor or any of its officers, employees or agents (including any franchise broker) as to the likelihood of success of the franchise.  Except as contained in the Franchisors' UFOC, the Franchisee acknowledges that it has not received any information from the Franchisor or any of its officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted franchise sales, profits or earnings.  If the Franchisee believes that is has received any information concerning actual, average, projected or forecasted franchise sales, profits or earnings other than those contained in the UFOC, please describe these in the space provided below or write "None."

(Ex.A, Disclosure Acknowledgement Statement)   In the space provided, each plaintiff wrote "None."

In the face of these clear and unambiguous disclaimers and non-reliance clauses, plaintiffs cannot plausibly claim that they reasonably relied on oral statements concerning likely profits and expenses in deciding whether to invest in a Quiznos franchise.  "[I]t is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying." *Hardee's of*

*Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir. 1994); *see also Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000) ( holding that a written non-reliance clause precludes any claim of deceit by prior representations in security transaction); *Associates In Adolescent Psychiatry, S.C. v. Home Life Insurance Co.*, 941 F.2d 561, 571 (7th Cir.1991) ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements."). In the absence of such reliance, no fraud can be shown. Accordingly, to the extent plaintiffs' alleged scheme to defraud rests on oral representations made by Area Directors, it must fail.

Plaintiffs face a similar problem with respect to their allegations of fraudulent omission. The general rule is that absent a duty to disclose, one cannot be liable in fraud for a failure to disclose. *See Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("Silence is not 'fraud' without a duty to disclose."). Plaintiffs argue that under Wisconsin law, Quiznos clearly had such a duty under the circumstances alleged.[2] Citing *Ollerman v. O'Rourke Co., Inc.*, 288 N.W.2d 95 (Wis. 1980), plaintiffs note that Wisconsin has recognized a duty to disclose on the part of a seller in a real estate transaction for more than thirty years. (Br. In Opp. at 28.) In *Ollerman*, the Wisconsin Supreme Court held that "a subdivider-vendor of a residential lot has a duty to a 'non-commercial' purchaser to disclose facts which are known to the vendor, which are material to the transaction, and which are not readily discernible to the purchaser." 288 N.W.2d 107. More

---

[2]Although the franchise agreements provide that any dispute between them is to be governed by Colorado law, the parties agree that Colorado law does not differ meaningfully from that of Wisconsin and have both cited Wisconsin law in support of their respective arguments. Following their lead, I will apply Wisconsin law to those issues governed by state law. *See Kochert v. Adagen Medical Intern., Inc.*, 491 F.3d 674, 677 (7th Cir. 2007) ("Where the parties have not identified a conflict in state law, we will generally apply the law of the forum state.").

9

recently, in *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205 (Wis. 2005), the Court extended the rule to business transactions in general, stating:

> we conclude that a party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

699 N.W.2d at 213. Even apart from the *Ollerman* exception, Wisconsin also recognizes the rule that a duty to disclose may arise where a seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression and he does so. *Ollerman*, 288 N.W.2d at 102.[3] Liability under federal law for the crimes of mail and wire fraud also extends to fraudulent omissions. *See United States. v. Morris*, 80 F.3d 1151, 1160-61 (7th Cir. 1996); *Emery v. American Gen. Fin., Inc.*, 71 F.3d 1343, 1346 (7th Cir.1995).

Plaintiffs argue that one or both of these exceptions to the rule of *caveat emptor* is applicable here. They argue that the very nature of the transaction required that Quiznos disclose such items as the true cost of advertising, the number of Quiznos franchises that had closed, and the substantial "markups and kickbacks" that add to the cost of food and services the franchisee was required to

---

[3]This is also the position of the Restatement:

§ 551   Liability For Nondisclosure.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
             ***
(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading;

RESTATEMENT (SECOND) OF TORTS § 551.

10

purchase for Quizno affiliates or approved suppliers. Plaintiffs also allege that Quiznos provided partial information that required further disclosure so as to avoid misleading them. For example, they allege that Quiznos provided marketing materials specifying food costs and other percentages calculated on an incomplete set of data, while withholding actual revenue figures based on more complete data. (Compl. ¶ 119(f).) Under these circumstances, plaintiffs allege that Quiznos' failure to fully disclose all of the costs they would incur constitutes fraud.

Leaving aside plaintiffs' pejorative and vague references to "substantial kickbacks and markups," however, a review of the UFOC and Franchise Agreement reveals that Quiznos did disclose to plaintiffs the charges they would be required to pay as Quiznos franchisees. Item 8 of the UFOC, for example, states:

> We and our affiliates have the right to receive payments from suppliers on account of their dealings with you and other Franchisees and to use the amounts we receive without restriction (unless we or our affiliates agree otherwise with the supplier) for any purpose we or our affiliates deem appropriate. We and our affiliates negotiate purchase arrangements with suppliers for the benefit of Franchisees, which often include volume discounts. Some suppliers pay us and/or our affiliates fees for products purchased through these negotiated agreements, and willingness to pay us and/or our affiliates may be a condition of our approval.

(Br. In Supp., Ex. B. at 26.) The UFOC also advised prospective franchisees of estimated initial food and other costs, and informed them that franchisees "must participate in any promotion campaigns and advertising and other programs the we periodically establish or approve." (Ex. B at 22, 36.)

The Franchise Agreement likewise provided that the franchisee must "purchase all equipment, products, services, supplies, and materials required for the operation of the Restaurant from manufacturers, suppliers, or distributors designated by Franchisor." The Agreement further stated

11

that the designated supplier may be a single supplier, or it may be Quiznos or its affiliates, and advised that,

> Franchisor and its affiliates may receive payments from suppliers on account of such suppliers' dealings with Franchisee and other franchisees and may use all amounts so received without restriction and for any purpose Franchisor and its affiliates deem appropriate.

(Ex. A § 13.4.)  If Quiznos in fact imposed additional charges on its franchisees or charged them a higher percentage for such items as advertising or promotional costs than it promised, it may be liable for breach of contract.  But in the face of these disclosures, plaintiffs' claim that the defendants induced them to purchase their franchises by fraudulently concealing such information cannot stand. A party cannot reasonably rely on allegedly fraudulent statements directly contradicted by the terms of a subsequently executed contract.  *See Amplicon Inc. v. Marshfield Clinic*, 786 F.Supp. 1469, 1478 (W.D.Wis.1992).

This is not to say that Quiznos disclosed the exact cost of the essential goods its franchisees would be required to purchase.  But how could it?  The price of goods and services is constantly changing.  More importantly, Quiznos made clear it was not disclosing actual costs or the profits plaintiffs could expect.  Quiznos explicitly cautioned plaintiffs that it was furnishing no information as to "actual or potential sales, earnings or profits."  (Ex. B at 53.)  And as to the average gross sales figures it presented, Quiznos told prospective franchisees that the figures did not reflect "deductions for continuing advertising and royalty fees payable to the franchisor and all other operating expenses."  (*Id.*)  As to deductions for those expenses and a partial list of other expenses they would incur, plaintiffs were directed to other items in the UFOC.  They were also advised "to seek professional assistance, to have professionals review the documents and to consult with other

12

franchisees regarding the risks associated with the purchase of the franchise." (Ex.A, Disclosure Acknowledgement Statement.) Finally, the UFOC plaintiffs received includes a list of Quiznos franchisees with operating restaurants as of December 31, 2002, and a list of a list of franchisees and Area Directors who had left the system or not communicated. Both lists include addresses and telephone numbers. Thus, to the extent Quiznos did not provide specific cost figures, it was clear to prospective franchisees that they lacked that information. It was also clear how they could obtain further information if they needed it.

This is a far cry from the situation in *Ollerman* and *Kaloti Enterprises*. In *Ollerman*, the seller failed to disclose to the buyer the existence of an underground well, and in *Kaloti Enterprises* a food producer failed to disclose to one of its secondary suppliers prior to a new purchase agreement that it was changing its marketing strategy and would be making direct sales to the supplier's customers for a lower price. In both cases, the buyer had no knowledge of the crucial fact, i.e. the underground well or the change in marketing strategy, that rendered the transaction disadvantageous to the buyer. But not only was the buyer in those cases unaware of crucial information, he had no reason to suspect that such facts may exist. In other words, he was unaware that he was unaware. Here, by contrast, the plaintiffs knew that they would be charged for the essential goods and services needed to operate the franchise and they also knew they did not have exact costs for those goods and services. They went forward with the transaction knowing that they did not have that information. This is not fraud. As the Wisconsin Supreme Court remarked in *Kaloti Enterprises*, "parties to a business transaction must "use their faculties and exercise ordinary business sense, and not [ ] call on the law to stand *in loco parentis* to protect them in their ordinary dealings with other business people." *Kaloti Enterprises*, 699 N.W.2d at 213 (*quoting Ollerman*,

288 N.W.2d at 101).


## C. Unconscionability

In response to Quiznos' contention that their claims of fraud are effectively gutted by the explicit disclosures, disclaimers and non-reliance clauses contained in the UFOC and Franchise Agreements, plaintiffs argue that the court should ignore the terms of the Franchise Agreement because the Franchise Agreement is unconscionable and therefore unenforceable. They contend that the Franchise Agreement was offered on a take-it-or-leave-it basis and not only "give[s] the defendants *carte blanche* to exploit the franchisees at will (for example, by authorizing Quiznos to place a new store right down the block from an existing franchise, or by requiring franchisees to buy items they need only from Quiznos-owned or -approved suppliers at what turn out to be grossly inflated prices)," but also "purports to eviscerate the franchisees' ability to seek, let alone obtain, any meaningful redress for harm they suffer at Quiznos' hands." (Br. In Opp. at 7-8.) While Plaintiffs do not seek a determination at this time that the franchise agreements are unconscionable, they contend that the issue is sufficiently raised to render premature Quiznos' contract-based arguments in support of their motion for summary judgment.

Under Wisconsin law, an entire contract or a provision of a contract is invalid if it is unconscionable. *Wis. Auto Title Loans, Inc. v. Jones*, 290 Wis.2d 514, 714 N.W.2d 155, 164 (2006). "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Discount Fabric House of Racine, Inc. v. Wisconsin Tel. Co.*, 657 N.W.2d 417, 424 (Wis. 1984). In order to be declared invalid as unconscionable, a contract or

14

provision thereof must be both procedurally and substantively unconscionable. *Jones,* 714 N.W.2d at 164. Procedural unconscionability, called "bargaining naughtiness" by Professor Leff, *see* Leff, Arthrur, *Unconscionability and the Code-The Emperor's New Clause,* 115 U. Pa. L.Rev. 485, 487 (1967), requires consideration of the factors that bear on the formation of the contract, including the age, education, intelligence, business acumen and experience of the party challenging the contract; the relative bargaining power of the parties; who drafted the contract; whether the terms were explained to the weaker party; whether alterations in the printed terms would have been permitted by the drafting party; and whether there were alternative providers of the subject matter of the contract. *Jones,* 714 N.W.2d at 166 (*citing Discount Fabric House of Racine, Inc. v. Wisconsin Tel. Co.,* 117 Wis.2d 587, 602, 345 N.W.2d 417 425 (1984)). Substantive unconscionability, on the other hand, pertains to "the contract terms themselves, and requires a determination whether they are commercially reasonable." *Discount Fabric House,* 345 N.W.2d at 425; *see also Deminsky v. Arlington Plastics Mach.,* 259 Wis.2d 587, 657 N.W.2d 411, 422 (2003). As the Wisconsin Court of Appeals recently explained,

> No single, precise definition of substantive unconscionability can be articulated. Substantive unconscionability refers to whether the terms of a contract are unreasonably favorable to the more powerful party. The analysis of substantive unconscionability requires looking at the contract terms and determining whether the terms are "commercially reasonable," that is, whether the terms lie outside the limits of what is reasonable or acceptable. The issue of unconscionability is considered "in the light of the general commercial background and the commercial needs."

*Caody v. Cross Country Bank,* 299 Wis. 2d 420, 729 N.W.2d 732, 742 (Ct. App. 2007) (*quoting Jones,* 714 N.W.2d at 166)).

In order for a court to declare a contract unconscionable, it must find "a mixture of both

procedural and substantive unconscionability." *Jones,* 714 N.W.2d at 165. The analysis is made on "a case-by-case basis. The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa." *Id.* The court must then "weigh all the elements of unconscionability and may conclude unconscionability exists because of the combined quantum of procedural and substantive unconscionability." *Id.* Given the imprecision of the concept and the myriad of factors that bear on the determination of unconscionability, many of which are unique to each individual franchisee, plaintiffs argue that the issue should be postponed until a complete record is established.[4]

Quiznos, on the other hand, argues that plaintiffs' claim that the Franchise Agreement is unconscionable is "completely baseless" and urges the Court to reject plaintiffs' argument to the contrary. (Reply Br. at 2-3.) It notes that there is no suggestion that plaintiffs were somehow forced to become Quiznos franchisees, since there are plenty of other franchise opportunities available. Moreover, the precedent plaintiffs cite in support of their contention that the Franchise Agreement is unconscionable, Quiznos observes, involves unsuspecting consumers who signed standard form contracts for common, if not essential, goods or services. This case, by contrast, involves individuals with the means and business acumen to purchase and operate a restaurant. Because they have failed to allege facts that would support the suggestion that plaintiffs are individuals "having limited financial means and unequal bargaining power," Quiznos contends that there is no basis upon which the Court could find procedural unconscionability. (Reply at 4.)

_____

[4] Of course, plaintiffs' argument for individual consideration of the circumstances surrounding the formation of the contract for each franchise also undermines their contention that not only are their individual claims properly joined, but that the case should be certified as a class action. But that is a different issue to be considered later.

16

As to substantive unconscionability, Quiznos contends that many of the provisions that plaintiffs claim are unconscionable apply to both parties and thus cannot be considered one-sided. By way of example, Quiznos notes that the one-year limitations period applies to its claims as well as those of the plaintiffs. The same is true of the waiver of jury trial, the requirement that claims be brought on an individual basis, and the agreement to have disputes determined in a Colorado forum applying Colorado law. Quiznos also notes that provisions such as those barring class actions and punitive damages, waiving jury trial and placing a one-year limitation on claims have been found enforceable by other courts and are hardly "so one-sided as to shock the conscience." (Reply at 6.)

I conclude that plaintiffs' assertion that certain provisions of the contract they signed are unconscionable does not preclude consideration of Quiznos' contractual defenses, at least those that clearly apply and do not even arguably offend public policy. "[C]ontract law is grounded on the principle of freedom of contract, which protects the justifiable expectations of parties to an agreement, free from governmental interference." *Jones*, 714 N.W.2d at 163. The rule is well-established in Wisconsin, as in all states, that courts may not rewrite a clear and unambiguous contract, or use the mechanism of construction to review an unambiguous contract to relieve a party from any disadvantageous terms to which the party has agreed. *Algrem v. Nowlan*, 37 Wis. 2d 70, 154 N.W.2d 217, 221 (1967). While the rule that unconscionable contracts or contract provisions are unenforceable is an exception to the general principle of freedom of contract, this does not mean that an evidentiary hearing is required in any case in which there is a bare allegation that a contract on which a claim or defense is based is unconscionable. Otherwise, unconscionability would become the primary dilatory defense in contract litigation. Calamari and Perillo, *The Law of Contracts* § 9.39, at 371 (4th ed. 1998). Such a rule would unreasonably increase the cost of doing business by

17

creating uncertainty and adding to the litigation expenses in an economy that many already regard as over-burdened by the costs of litigation.

Here, plaintiffs offer nothing, not even allegations, that would support a finding of procedural unconscionability. The very facts alleged in the complaint belie the suggestion that they are unsophisticated or vulnerable individuals of whom advantage is easily taken. The plaintiffs are purchasers and owners of businesses which they undertook to operate and have operated, some for more than six years. All appear to have formed corporations or limited liability companies to operate their businesses. (Compl. ¶¶ 9-33.) As Judge Posner remarked in a similar setting, "[t]he Sigels are not vulnerable consumers or helpless workers. They are business people who bought a franchise (actually two, though the other isn't in issue in this case) in another state as an investment to be managed by local managers. They were not forced to swallow unpalatable terms. They have rightly declined even to argue unconscionability." *Original Great American Chocolate Chip Cookie Co. v. River Valley, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992).

Similarly, Judge Clevert rejected a challenge to an arbitration clause in an automobile finance agreement with Nissan Motor Acceptance Corporation (NMAC), stating:

> Here, Johnson has not demonstrated that she had no meaningful choice. While NMAC or the dealer may have more bargaining power and economic strength, the alternative sources of supply may or may not have been plentiful. However, based on the record, it is difficult to believe that Johnson was forced to buy this particular used car at this particular dealership using this particular financing. She purchased a used Chevrolet Tahoe from a Nissan dealership in the Milwaukee metropolitan area. Like any car purchaser, she could have walked out and taken her business elsewhere, both for the car and for the financing. She could have gone to a Chevrolet dealer, a car dealer affiliated with companies other than NMAC, or any independent used car lot. She could have obtained financing from a bank, a credit union, or a friend. She even could have saved in advance and purchased a car at a later time using less, or no, financing at all. In sum, she had numerous options and was not over a barrel in accepting NMAC's contract.

18

*Battle v. Nissan Motor Acceptance Corp.*, 2007 WL 1095681, *6 (E.D.Wis. March 9, 2007). The same is true here. A court does not need to conduct an evidentiary hearing to recognize that there are numerous franchising and other investment opportunities available in this state. Plaintiffs cannot plausibly claim that they had no other choice.

It is also clear from the UFOC and the Franchise Agreement that plaintiffs were not prevented from carefully considering the Agreement before signing it or obtaining outside advice. Each franchisee expressly acknowledged that "it has had the opportunity to personally and carefully review" the UFOC and Franchise Agreement, and that it had been "advised to seek professional assistance, to have professionals review the documents and to consult with other franchisees regarding the risks associated with the purchase of the franchise." (Ex. A. Disclosure Acknowlegment Statement.). Each was also advised in the body of the Agreement that "BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL ...." (Ex. A. § 23.12.) This is not the advice of a party engaged in "bargaining naughtiness." Under these circumstances, plaintiffs' unsupported assertion of procedural unconscionability rings hollow.

On the issue of substantive unconscionability, plaintiffs point to the provision of the Franchise Agreement under which Quiznos is alleged to have directly or indirectly extracted exorbitant payments from its franchisees for the services, goods and materials essential to their businesses. They also claim that provisions intended to limit their means of redress are unconscionable. These include a prohibition on suing individual officers, agents or affiliates of Quiznos, a truncated (one-year) statute of limitations of any and all claims, a bar on punitive or exemplary damage claims, waiver of the right to a jury trial, prohibition of class actions and consolidation of claims or cases,

19

and a forum selection and choice of law clause requiring cases to be brought in Colorado and decided under Colorado law. Citing cases such as *Jones*, plaintiffs argue that some or all of these provisions may be substantively unconscionable.

But in *Jones*, the Court struck down a one-sided arbitration provision in a short-term loan agreement which allowed the lender to enforce its rights in the circuit court but required the borrower to submit any counterclaims to arbitration. 696 N.W.2d at 220. Only one of the cases plaintiffs cite involves a franchise agreement. In *Bolter v. Superior Court*, 87 Cal.App.4th 900 2001), the Court struck down an arbitration clause in a franchise agreement that required the California franchisees to arbitrate their claims against the franchisee in Utah. All of the other cases upon which plaintiffs rely, however, involve consumer credit card or purchase agreements. *See Coady v. Cross Country Bank, Inc.*, 729 N.W.2d 732 (Wis. 2007) (holding arbitration clause in credit card agreement unconscionable); *Powertel v. Bexley*, 743 So.2d 570 (Fla. App. 1999) (holding arbitration clause added to contract for cellular telephone service unconscionable); *Kinkel v. Cingular Wireless LLC,* 857 N.E.2d 250 (Ill. 2006) (holding the class action waiver provision of cellular telephone service contract unconscionable); *Lozado v. Dale Baker Oldsmobile, Inc.*, 91 F. Supp.2d 1087 (W.D. Mich. 2000) (holding arbitration provision of automobile installment sales agreement unconscionable); and *Wong v. T-Mobile USA*, 2006 WL 2042512 (E.D. Mich. July 20, 2006) (holding class action waiver in cellular telephone service agreement unconscionable).

Nothing in *Jones* or any of the other cases cited by plaintiffs offer any support for their contention that I should ignore the clear and unequivocal disclaimers, disclosures and non-reliance clauses set forth in the UFOC they received and the Franchise Agreement they signed. On the basis of those disclaimers, disclosures and non-reliance clauses, I conclude that plaintiffs' claim of fraud

cannot stand. And without a tenable claim of fraud, plaintiffs' RICO claims fall for failure to state a claim. *See Matter of VMS Ltd. Partnership Securities Litigation*, 803 F.Supp. 179, 192 (N.D.Ill. 1992) ("In the court's view, plaintiffs' RICO claims, as well as the related mail and wire fraud claims, are inadequate as a matter of law. Plaintiffs have failed to allege specific facts sufficient to overcome the exhaustive disclosures and warnings contained in the private placement memoranda and the subscription agreements that plaintiffs signed."). Accordingly, defendants' motion to dismiss will be granted as to plaintiff's RICO claims and their claim of fraud in the inducement.

**D. Sherman Act Claim**

Plaintiffs have also asserted a claim under Section 1 of the Sherman Act and the Wisconsin Antitrust Act.[5] To state a claim for relief under Section 1, a plaintiff must allege either that a contract, combination, or conspiracy resulted in a per se violation of the Sherman Act or that it unreasonably restrained competition in a relevant market. *See Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993); *Banks v. National Collegiate Athletic Ass'n*, 977 F.2d 1081, 1088 (7th Cir. 1992); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982). Here, plaintiffs claim that Quiznos orchestrates tying arrangements that are either illegal per se, or otherwise unreasonably restrain competition. (Compl. ¶ 155.)

---

[5] The Wisconsin Antitrust Act provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." Wis. Stat. § 133.03. This language is nearly identical to that of Section 1 of the Sherman Act, which states, "every contract, combination in the form of trust or otherwise, conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Therefore, although the Court's analysis will focus on plaintiffs' claim under the Sherman Act, plaintiffs claim under the Wisconsin Antitrust Act will be dismissed for the same reasons. *See Conley Publ'g Group v. Journal Commc'ns*, 2003 WI 119, ¶ 17, 265 Wis. 2d 128, ¶ 17, 665 N.W.2d ¶ 17, *overruled on other grounds by Olstad v. Microsoft Corp.*, 2005 WI 121, 284 Wis. 2d 224, 700 N.W.2d 139.

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 462 (1992) (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)). For a tying arrangement to be actionable, the defendant must enjoy substantial market power in the tying product. *Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994) (citing *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670-74 (7th Cir. 1985)). As the Seventh Circuit has explained,

> [e]stablishing the necessary combination in a tying case requires exceeding subtlety, because the substantive theory of tying law depends on coercion to take two products as a package. The joint sale of two products is a "tie" only if the seller exploits its control of the tying product "to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."

*Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 669 (7th Cir. 1985) (*quoting Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)); *see also Digital Equip. v. Uniq Digital Technologies*, 73 F.3d 756, 761 (7th Cir. 1996) ("Unless the seller has market power, ... the practice is of no antitrust concern."). Plaintiffs claim that Quiznos illegally ties the sale of their franchises (the tying product) to the subsequent sale of the "Essential Goods" required to operate the franchises, (the tied product). (Compl. ¶¶ 143-56.) Plaintiffs allege that because Quiznos enjoys substantial market power in the "Quick Service Toasted Sandwich Restaurant Franchise" market, the tying arrangement under which its franchisees must purchase Essential Goods from its affiliates or approved suppliers is unlawful.

Relying on the Third Circuit's decision in *Queen City Pizza v. Domino's Pizza, Inc.*, 124

22

F.3d 430, 436 (3d Cir. 1997), Quiznos argues that plaintiffs' antitrust claims fail because the complaint fails to allege "a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." (Br. In Supp. at 20.) In *Queen City Pizza*, the Third Circuit affirmed the district court's Rule 12(b)(6) dismissal of the plaintiff's Sherman Act claims for failure to plead a valid relevant market. The court noted that "in most cases proper market definition can be determined only after a factual inquiry into the commercial realities face by consumers." 124 F.3d at 436. *Queen City Pizza* held, however, that "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* Quiznos contends that plaintiffs' complaint has the same defect.

As an initial matter, plaintiffs argue in response that Quiznos' argument is a premature request for summary judgment. Citing *Conley v. Gibson*, 355 U.S. 41 (1957), plaintiffs contend that at the pleading stage a court can dismiss a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim." (Br. In Opp. at 42 (*quoting Conley*, 355 U.S. at 45-46.)) Noting that questions relating to the existence of and boundaries to a relevant market in antitrust cases are for the trier of fact and that much of the economic evidence in such cases is in the hands of the defendant, plaintiffs argue that "dismissal prior to giving plaintiff ample opportunity for discovery should be granted very sparingly." (*Id.* at 42-43 (*quoting Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738,746 (1976).) But as noted above, *Twombly,* which explicitly repudiated the *Conley* formula for assessing the sufficiency of a claim, requires, especially for

Case 1:06-cv-01210-WCG   Filed 11/05/07   Page 23 of 28   Document 108

antitrust claims, that a complaint set forth sufficient facts to show plausible grounds exist for believing a violation has occurred. 127 S. Ct. at 1968. Quiznos' argument goes directly to whether plaintiffs' complaint meets this standard. For absent some suggestion that Quiznos exercised substantial market power in a relevant product market, plaintiffs antitrust claim should not be permitted to continue into "its inevitably costly and protracted discovery phase." *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F.Supp.2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation). In light of *Twombly*, I do not find Quiznos' argument premature.

The relevant product market, for purposes of anti-trust law, includes all "products that have reasonable interchangeability for the purposes for which they are produced – price, use, and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). Products are considered reasonably interchangeable if consumers treat them as "acceptable substitutes." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2nd Cir. 2002). "[T]he relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants." *Id.* (*quoting FTC v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 46 (D.D.C.1998)). A key consideration in determining the relevant market is cross-elasticity of demand. "Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." *Queen City Pizza*, 124 F.3d at 438, n 6 (*quoting* E. Thomas Sullivan and Jeffrey L. Harrison, *Understanding Antitrust and its Economic Implications* 217 (1994)).

In the area of franchises such as Quiznos, the relevant product market would include equivalent investment opportunities. As one commentator has explained,

Case 1:06-cv-01210-WCG   Filed 11/05/07   Page 24 of 28   Document 108

> From the perspective of sound analysis and consistency with the fundamental legal principle, it is patent that-at the minimum-a franchisor market power assessment requires reference to all alternatives available to the potential consumer in a broad line of business endeavors. In many cases this will extend to the market for franchises of all types or the employment of capital. For market power to exist there must be something that shows that, pre-contract, the seller had the power to force a potential franchisee to purchase something that would not have occurred in a competitive market-a requirement drawn directly from *Jefferson Parish*.

Alan Silberman, *The Myths of Franchise "Market Power"*, 65 Antitrust L.J. 181, 206 (1996). Considered in this light, plaintiffs' assertion that the "Quick Service Toasted Sandwich Restaurant Franchise" market constitutes the relevant product market in which to assess Quiznos' market power is patently absurd. It may well be that Quiznos holds substantial market power for those investors who wish to purchase a fast food franchise that sells toasted submarine sandwiches. But that's like saying that the seller of any franchise known for a particular product has market power over investors who are already determined to sell such a product. That cannot be the test. The mere fact that a particular franchise is known for a unique product and way of doing business does not show market power over investors. *Will v. Comprehensive Accounting Corp.*, 776 F.2d at 672-73; *see also Tominaga v. Shepherd*, 682 F. Supp. 1489, 1494 (C.D. Calif. 1988) (stating that in assessing tying claim against combination chicken/pizza franchise "[p]ossible relevant markets include take out pizza franchises, fast food franchises or restaurant franchises in general"). Product identification or branding is at the very core of franchising. The crucial question is whether Quiznos was in a position to coerce investors not otherwise determined to do so to purchase its franchise.

Leaving aside the question of whether a franchise can be a tying product, *see Will,* 776 F.2d at 671 ("'franchises' (the tying product here) are just names and methods of doing business, not 'products' and some courts have held that as a matter of law there cannot be a tie-in between a name

and a product, ....), there is no suggestion in the complaint that Quiznos' enjoyed any pre-contract

market power over plaintiffs and other potential investors. Indeed, plaintiffs claim they purchased

the franchises not because of Quiznos' overwhelming market power but because of its fraudulent

inducements. A seller with overwhelming market power does not need to resort to fraud to induce

buyers to purchase his product.

It is true that after plaintiffs became Quiznos franchisees, Quiznos was able to exercise

substantial power over them. It was able to determine the suppliers from whom plaintiffs were

required to purchase the products and services needed to operate the franchises. The gist of

plaintiffs' complaint is that Quiznos exercised this authority so as to extract exorbitant payments

from them. But this was due to the contractual provisions of the Franchise Agreement each of the

plaintiffs signed, not Quiznos' market power. This is not the kind of harm the Sherman Act was

intended to prevent. As *Queen City Pizza* observed,

> Plaintiffs need not have become Domino's franchisees. If the contractual restrictions
> in section 12.2 of the general franchise agreement were viewed as overly burdensome
> or risky at the time they were proposed, plaintiffs could have purchased a different
> form of restaurant, or made some alternative investment. They chose not to do so.
> Unlike the plaintiffs in *Kodak*, plaintiffs here must purchase products from Domino's
> Pizza not because of Domino's market power over a unique product, but because
> they are bound by contract to do so. If Domino's Pizza, Inc. acted unreasonably
> when, under the franchise agreement, it restricted plaintiffs' ability to purchase
> supplies from other sources, plaintiffs' remedy, if any, is in contract, not under the
> antitrust laws.

124 F.3d at 441 (footnote omitted).

The same analysis applies here. Plaintiffs need not have become Quiznos franchisees. As

one scholar has noted, "[t]here are literally thousands of franchise opportunities available to

prospective investors, and federal law operates to ensure that prospective investors are given

26

information about the likely costs and revenues of a particular franchise opportunity in order to help them make an informed choice." George A. Hay, *Is the Glass Half-Empty or Half-Full?: Reflections on the Kodak Case*, 62 Antitrust L.J. 177, 188 (1993). Having chosen to become Quiznos franchisees, plaintiffs are bound by the terms of the franchise agreements they signed. If Quiznos has breached its agreement with them by charging them exorbitant prices for the goods and services needed to operate their franchises, their remedy lies in contract, not under the antitrust laws. Accordingly, I conclude that plaintiffs' antitrust claims should be dismissed.

## E. Remaining State Law Claims

Having disposed of plaintiffs federal claims and those state claims inextricably intertwined with them, the question arises as to what action should be taken with respect to plaintiffs' remaining state law claims. "[T]he general rule is that, when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir.1994). The rule is "designed to minimize the occasions for federal judges to opine on matters of state law." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). Of course, if an obvious interpretation of state law eliminates a plaintiff's state claim, "the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case." *Id.* That is not the case here, however, with respect to the claims that remain. The outcome of plaintiffs' breach of contract claims and their claims under Wisconsin's Fair Dealership Law and Deceptive Trade Practices Act are not obvious and may be more appropriately considered by Wisconsin's state courts. Accordingly, while those claims are also dismissed, the dismissal is without prejudice.

27

**IT IS THEREFORE ORDERED** that the defendants' motion to dismiss is granted. Plaintiffs' first and second (civil RICO), third and fourth (federal and state antitrust), and sixth (fraud in the inducement) claims for relief are dismissed with prejudice. The remaining state law claims are dismissed for lack of jurisdiction without prejudice.

Dated this 5th day of November, 2007.

/s William C. Griesbach
William C. Griesbach
United States District Judge